**STANDARD OIL COMPANY OF CALI-
FORNIA, a corporation, Appellant,**

v.

**Clyde A. PERKINS, Appellee.**

**No. 19436.**

United States Court of Appeals
Ninth Circuit.

Nov. 2, 1967.

As Amended on Denial of Rehearing
July 1¹, 1968.

Pillsbury, Madison & Sutro, Eugene M. Prince, Francis R. Kirkham, H. Helmut Loring, Richard J. MacLaury, San Francisco, Cal., Koerner, Young, McColloch & Dezendorf, (now McColloch, Dezendorf & Spears), Wayne Hilliard, Portland, Or., for appellant.

Roger Tilbury, Portland, Or., Bonyhadi & Hall, Ernest Bonyhadi, Bruce M.

Hall, Portland, Or., of Rives & Schwab, for appellee.

Before HAMLEY, KOELSCH and DUNIWAY, Circuit Judges.

KOELSCH, Circuit Judge.

Clyde A. Perkins brought this suit against the Standard Oil Company of California to recover treble damages for injuries allegedly resulting from Standard's price and price-related discriminations in the sale of gasoline and oil in violation of Section 2(a), (d) and (e) of the Clayton Act, as amended by the Robinson-Patman Act.

At the conclusion of a protracted trial, the jury rendered its verdict for Perkins and against Standard assessing damages in the total sum of $336,404.57.[1]

The court trebled this award and allowed Perkins $289,000 as an attorney's fee (15 U.S.C. § 15) for a total of $1,298,213.71. Standard has appealed.

Perkins started in the gasoline and oil business during 1938 as the proprietor of a single service station in the State of Washington. Over the years he acquired many more stations throughout that State and a number in Oregon. In addition, he became a wholesaler in this same territory. There he operated several bulk storage plants and sold gasoline to other wholesalers, to retailers, and to commercial users. In 1945 Perkins, together with two other dealers whose operations were similar to his own, entered into the first of a series of so-called "consignment supply contracts" with Standard, under which Standard sold them all the gasoline and oil which they required. None of the three was interested in the business of any other.

During 1952 Perkins organized two corporations—Perkins of Oregon and Perkins of Washington—to whom he respectively sold his gasoline and oil business and leased all his bulk plants and most of his service stations. The corporations continued to carry on a wholesale business but sublet all service stations, save for one operated by Perkins of Washington in Vancouver, Washington. Standard knew of these transactions but did not negotiate sales contracts with the corporations or terminate the existing one with Perkins. It continued to supply the gasoline and to bill Perkins.

On December 2, 1957 the Perkins businesses were sold to a major oil company and the contract with Standard was terminated.

Fifteen months later, on March 2, 1959, Perkins filed this suit. As ultimately submitted to the jury it comprised three claims: the first, that of Perkins individually; the second, that of Perkins of Oregon; and the third, that of Perkins of Washington.

Broadly stated, Perkins' contention was that throughout a period extending from March 1, 1955, through December 1957, he and the two Perkins corporations sustained injury to business and property because (a) Standard had charged the Signal Oil & Gas Co. and the operators of Standard's Chevron and Signal Service Stations (hereinafter referred to as "Branded Dealers")[2] less for the same grade and quality of petroleum products than Standard had charged him and the two Perkins corporations; (b) Standard had paid the Branded Dealers, but not him and the two Perkins corporations, for services and facilities furnished by the Branded

---

1. The form is denominated "special verdict." In it the above sum, referred to as the amount of the "general verdict," is divided into three parts, each labeled "special verdict"; each part is allocated to a particular claim as follows:

"(1) * * * on the first cause of action of
Clyde Perkins individually     $185,022.52
(2) on plaintiff's second cause of action of
Perkins Oil Co. of Oregon     84,101.14
(3) on plaintiff's third cause of action of
Perkins Oil Co. of Washington     67,280.91

---

2. This is the term applied in the trade to proprietors of retail service stations whom Standard authorized to use its brand names in their advertising.

Dealers in connection with the sale of Standard's products; and (c) Standard likewise furnished said Branded Dealers valuable services not rendered to him and the two Perkins corporations.[3] He did not contend that his alleged injury resulted from his inability to compete with Standard itself but rather that his injury stemmed from Standard's price favoritism to Signal and the Branded Dealers, which favoritism impaired and destroyed competition between Perkins and certain others of those who sold Standard's products.[4]

The Branded Dealers purchased gasoline and oil from Standard which they in turn sold at retail. With respect to them, Perkins' story is quickly told. Because of Standard's favoritism and discrimination they were able to and did offer lower prices and better services and facilities than Perkins in marketing at retail.

Signal Oil & Gas Co., like Standard, featured in this litigation exclusively as a supplier. It assertedly passed on to its customers a large part of the more favorable price that it received from Standard and thus enabled its customers (some of whom were retailers and others jobbers) to undersell Perkins.

Section 2(a) of the Act, in terms, limits the distributing levels on which a supplier's price discrimination will be recognized as potentially injurious to competition. These are: on the level of the supplier-seller in competition with his own customer; on the level of the supplier-seller's customers; and on the level of customers of customers of the supplier-seller.[5]

■ The record in this case manifests that a substantial part of the damages assessed against Standard with respect to each claim was necessarily rested upon the marketing of gasoline and oil by a corporation known as Regal Stations Company. The conclusion is also inescapable that Regal was not a customer of a customer within the purview of Section 2(a) of the Act.[6] It follows that

3. The relevant provisions of the Robinson-Patman Act, relied upon by Perkins, are contained in Section 2(a), (d) and (e); they make it unlawful for:

Sec. 2(a) "any person engaged in commerce * * * to discriminate in price between different purchasers of commodities of like grade and quality * * * where the effect of such discrimination may be substantially to lessen competition * * * with any person who * * * knowingly receives the benefit of such discrimination or with customers of any of them;"

Sec. 2(d) "for any person engaged in commerce to pay * * * a customer * * * for any services or facilities furnished by * * * such customer in connection with * * * or offering for sale of any products * * * sold * * * by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities," and

Sec. 2(e) "for any person to discriminate in favor of one purchaser against another purchaser * * * of a commodity bought for resale * * * by * * * furnishing * * * any services * * * connected with the handling, sale, or offering for sale of such commodity so purchased upon term not accorded to all purchasers on proportionally equal terms."

4. Hereinafter, the name "Perkins" includes Perkins individually and also the two Perkins corporations.

5. Mr. Rowe, in his book, "Price Discrimination Under the Robinson-Patman Act," severely questions the validity even of this so-called "third line injury concept" included in Sec. 2(a) of the Act. Saying "this esoteric doctrine appears of dubious validity today" (p. 196) the author argues:

1. That it is doubtful that a causal relationship can exist between the supplier's lower price to a favored customer and injury to competition by that customer's customer with a disfavored customer;

2. Additionally that the concept requires supplier's control over his customer's pricing; this can give rise to serious anti-trust problems of price control.

6. Regal commenced to retail gasoline and oil in Portland during the summer of 1956 and soon was operating a number of service stations there. It accompanied a well publicized entry into the market with a scale of prices well be-

the detrimental effect Regal exerted upon competition is not attributable to and would not support an award of damages against Standard; that the whole verdict is tainted, since the amount reflected in it by Regal's conduct cannot be ascertained; and that the judgment must be reversed and a new trial had.

Inasmuch as the case must be returned to the district court and tried anew, we believe it appropriate to briefly comment upon several of Standard's remaining points.

The factual issues of whether or not the two Perkins corporations, prior to the commencement of this action, had assigned their claims to Perkins and whether the assignments were valid need not be relitigated. These issues were the subject of special interrogatories which the jury answered favorably to Perkins. They involved matters that

low that of other retailers and persisted in undercutting other retailers. Perkins took the position, which he supported with substantial evidence, that "While there had been some price disturbances in the Portland area prior to Regal, these were * * * of 'brush fire' dimensions while Regal precipitated a major conflagration"; and he further adduced proof tending to show that the impact of Regal's price policy went far beyond Portland; that it precipitated and sustained a sort of chain-reaction throughout Perkins' entire marketing area, and that it adversely affected both the wholesale and retail business carried on by Perkins.

While the record shows Regal sold Standard gasoline, it also shows that Regal purchased this gasoline from Western Hyway Oil Co., which in turn had purchased it from Signal which had originally purchased from Standard. Even granting that the proof demonstrated Standard uniformly charged Signal substantially less than Perkins, and further granting that Signal likewise passed on to its customer (Hyway) this price advantage, the competition complained of was not that with Signal or Signal's customer, Hyway.

Perkins sought to bring the competition within the statutory bounds. His contention—to again quote from his brief —was that "[b]oth Western Hyway and Regal were controlled subsidiaries of S[ignal] O[il] and G[as]."

It is true that the "close community of interest" discussed in Press Co. v. N.L.R.B., 73 App.D.C. 103, 118 F.2d 937 (1940), cert. denied 313 U.S. 595, 61 S. Ct. 1118, 85 L.Ed. 1548 (1941), existed between these three corporations: during the relevant period Signal owned 60% of the stock of Western and similarly from the outset and until October 1957, the latter corporation owned 55% of the stock of Regal. Thus Signal was in a position to exercise control over Regal. However, this fact alone is not enough. In National Lead Co. v. F.T.C., 227 F.2d 825 (7th Cir. 1955), reversed on other grounds, 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957) a cease and desist order against the parent corporation charged with the unlawful acts of its subsidiaries was set aside. The court held that to establish substantial identity between parent and subsidiary corporation under the Robinson-Patman Act, more must be shown than the fact that the subsidiaries were wholly owned, that they were controlled by interlocking directors and officers and that their operations were closely correlated. The test was whether the parent exercised such complete control that the subsidiaries' corporate identity was a "mere fiction"—were the subsidiaries "mere tools" of the parent. Similarly in the Press Co. case, cited above, the D.C. Circuit—albeit in a somewhat different context—followed and applied this same basic requirement, saying "Unless, therefore, the community of interest of which we have spoken * * * is enough to wipe out and destroy the corporate structure, the Board's conclusion that Gannett Co. was equally responsible in its corporate capacity for the acts done by Press Co. in its corporate capacity cannot be sustained. Of course, it is true that Gannett Co., as owner of all the voting stock of Press Co., was in a position to dictate its action in any corporate matter, but until legislation is adopted outlawing holding companies this alone, in circumstances like these is not sufficient to annul corporate identity * * *." (page 945). See also Baim & Blank, Inc. v. Philco Corp., 148 F. Supp. 541 (E.D.N.Y.1957); Kingston Dry Dock Co. v. Lake Champlain Transp. Co., 31 F.2d 265, 267 (2d Cir. 1929).

In the case before us the record reveals no substantial evidence to show that Signal in fact dictated the corporate decisions of either Western or Regal. Absent such proof, Regal must be deemed a separate and autonomous entity.

were entirely distinct and separable from the claims themselves; they appear to have been fully developed by the evidence; and they are in no way affected by the error which requires a reversal of the judgment.[7] On the new trial the fact of the assignments will be deemed established.

The trial judge's ruling, that the relevant four year statute of limitations had not operated upon the assigned claims to bar Perkins' right to maintain suit on them, was correct.

■■ We agree with Standard that if Perkins first asserted the claims on September 12, 1963 when, at the direction of the trial court he supplemented his contentions appearing in the pretrial order with the fact of the assignments, then his right to prosecute a suit on the claims had expired. The claims accrued not later than December 1957, and filing of the complaint in September 1959, would not have tolled the statute. "An amendment setting up such new * * * cause of action will not relate back to the date of the original petition, but will be governed by its own date, and if the bar of the statute of limitations or a bar to the right to maintain such new cause of action has intervened, the new cause of action must fail." Salyers v. United States, 257 F. 255 (8th Cir. 1919). In the case last cited, the pleadings clearly disclosed that plaintiff's amendment to the complaint introduced into the suit a new claim upon which suit was barred. Here they do not. To the contrary, this record demonstrates with equal clarity that the suit from the time of its commencement included these claims. True, Perkins did not assert the claims as assigned claims, but he did make clear from the outset that he was asserting ownership of all property and property rights injuriously affected and for which he was seeking to recover damages. The supplement merely separated several claims initially improperly commingled into their component parts.

■■ Neither did the court err in submitting to the jury Perkins' claims based upon Standard's alleged Section 2(d) and 2(e) violations. There was some evidence that Perkins and the Perkins corporations operated some service stations and, to that extent, Standard was obliged, under those sections, to make the same proportional payments and allowances to Perkins for such items as service station rest room maintenance, painting of service stations, advertising and credit card privileges, as it did to the Branded Dealers. We perhaps should add, a seller's obligation extends only to customers who compete with each other on the same functional level of distribution. Tri Valley Packing Ass'n v. F.T.C., 329 F.2d 694 (9th Cir. 1964). And a customer who functions both as a retailer and a wholesaler is entitled to receive proportionately equal treatment with respect to payments and services that the seller gives a competing retailer; but he is not entitled to such allowances with respect to his wholesale business as well.[8]

---

7. Indeed this court has previously passed on the issue. In the related case of Standard Oil Co. v. Perkins, 347 F.2d 379 (9th Cir. 1965) we affirmed the trial court's denial of Standard's motion under Rule 60(b) to set aside the judgment in that case on the grounds that the proof in this case disclosed that these same assignments upon which Perkins had relied were fraudulent and untimely.

8. A difference of legal opinion exists over the reach of Sec. 2(d) and 2(e) obligation. See Rowe "Price Discrimination Under the Robinson-Patman Act," 1964 Supplement, p. 89. The author,

however, points out on page 396 of his original text:

"* * * the F.T.C. 1960 guides indicate a limitation of the supplier's obligations * * * to competing 'customers' and define 'customer' as someone who buys directly from the seller or his agent or broker. This resolution of the issue properly balances the possibility of law avoidance against the practical difficulties of computing appropriate benefits accruing to wholesalers and other intermediate distributors * * * and the burdens of conditioning all suppliers promotional campaigns at the retail level on their si-

██ Standard's assignments also concern the trial court's rulings on evidence and the giving of instructions relating to damages. A brief discussion of several is warranted.

It will be recalled that the verdict comprised three claims: the claim of Perkins individually, and that of Perkins of Oregon, and Perkins of Washington.

With respect to Perkins' own claim the court, over Standard's objection, permitted him to show on the issue of damages that the Perkins corporations did not pay him 1(a) an agreed brokerage fee for securing their gasoline; (b) rentals on leases of service stations and other property, and (c) other indebtedness; 2 that he was unable to collect rentals for service stations leased to independent operators and 3 that the going concern value of his interest, as owner and lessor and as prime lessee and sublessee of service stations and bulk plants, substantially diminished.

We conclude: that items 1(a), (b) and (c) and 2 were not elements of injury properly the subject of damages, but that item 3 was. It follows that the rulings of the court were in part erroneous and in part right.

██ The problem is one of proximate cause. A person claiming damages must show that he was within the "target area" of the economy directly affected by the unlawful competitive practices, for "the rule is that one who is only *incidentally* injured by the violation of the antitrust laws,—the bystander who was hit but not aimed at,—cannot recover against the violator." Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358, 363 (9th Cir. 1955); Conference of Studio Unions v. Loew's, Inc., 193 F.2d 51 (9th Cir. 1951), cert. denied, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952).

The solution is not an easy one and admittedly there exists a difference of judicial opinion as to what constitutes a direct (as distinguished from a remote or consequential) injury to business or property within the meaning of Section 4 of the Clayton Act (15 U.S.C. § 15).

██ Congress Building Corp. v. Loew's, Inc., 246 F.2d 587 (7th Cir. 1957), contains an exhaustive canvass of many cases coupled with an illuminating discussion of the matter. In that decision the Seventh Circuit, noting that "[t]he courts have uniformly denied recovery to stockholders * * * creditors * * * and deposed officers of a corporation * * * who claimed injury as a result of alleged anti-trust violations * * *," suggests as a reason that "[t]o permit individual stockholder recovery would run counter to the traditional treatment of a corporate injury that the corporation is the proper party to redress corporate wrongs. And direct recovery by the individual creditor would give him a preference over other creditors of the insolvent business and such recovery may act to thwart the policy of the bankruptcy laws. Further, the number of stockholders and creditors might produce an insurmountable problem of multiplicity of suits." (pp. 590–591). However, the court went on to hold that a non-operating owner-lessor of a motion picture theatre had a recognizable claim for damages against its lessee and a third party who had conspired together to reduce the business at the theatre. The court pointed out that such a violation might cause injury to the reversion of the owner-lessor and that such an injury was one directly suffered. This court, in Steiner v. 20th Century-Fox Film Corp., 232 F.2d 190 (9th Cir. 1956), upon identical facts and using much the same reasoning, reached the same conclusion. However, in *Steiner* we noted that Harrison v. Paramount Pictures, Inc., 115 F. Supp. 312 (D.C.E.D.Pa.) affirmed per curiam, 211 F.2d 405 (3d Cir. 1954),

multaneous subsidization of other distributors along the way."
This was the view taken by this court in *Tri-Valley* and recently reaffirmed in F.T.C. v. Fred Meyer, Inc., 359 F.2d 351 (9th Cir. 1966). We note that this precise question is presently before the Supreme Court pursuant to a grant of certiorari in the *Meyer* case at the last term. 386 U.S. 907, 87 S.Ct. 853, 17 L. Ed.2d 781 (1967).

cert. denied, 348 U.S. 828, 75 S.Ct. 45, 99 L.Ed. 653, a case in which the lessor was not permitted to maintain a suit, was not factually similar "because in *Steiner* the lessee was a party to the unlawful combination, whereas in *Harrison* the lessee was not." Standard vigorously argues that the distinction is material and that the net effect of *Steiner* is that an actionable injury can result only where a conspiracy to injure the lessor is entered into between the lessee and a third person. We disagree. In our view, while the fact that the lessee did not participate in the wrongful act might give rise to problems of apportionment of damages between lessor and lessee for their respective injuries and be urged as giving rise to multiplicity of suits, these reasons do not militate in favor of the wrongdoer. As said in Congress Building Corp. v. Loew's, Inc., supra, (246 F.2d at 594) "The problem of multiplicity of suits * * * is not similar to stock-holder-creditor cases where a single entity exists to redress the wrong, for here there is no such entity. In fact, if the lessor cannot sue there will be no private redress for the defendant's wrongful acts. Furthermore, multiplicity is always present where the acts of the tortfeasor injure more than one individual." [9]

Many of Perkins' exhibits relating to damages treated the three Perkins businesses as one and reflected only consolidated sales, losses, etc. It was thus difficult, if not impossible, for the jury to rationally determine whether a particular business had suffered injury and if so to allocate damages amongst the three of them. In addition, such a combination of components could readily create a distorted image by making it appear, contrary to the fact, that all had been injured. So far as practicable, proof of the items of damage peculiar to one claim should always be kept separate from that of another. This is particularly true in a case as factually complicated as this one. Additionally, we note a common vice inherent in all these exhibits. The computations appearing in them were predicated in whole or in part upon the premise that Perkins was unable to compete with Regal because of Standard's price discrimination. But, as pointed out earlier in this opinion, Section 2(a) of the Act does not recognize a causal connection, essential to liability, between a supplier's price discrimination and the trade practices of a customer as far removed on the distributive ladder as Regal was from Standard. On that ground alone none of these exhibits should have been admitted into evidence.

Among the defenses urged by Standard was the one provided for in Section 2(b) of the Act (15 U.S.C. § 13(b)). That section, in a proviso, permits a discriminating seller to rebut "the prima facie case * * * by showing that his lower price * * * to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor * * *."

As part of its proof Standard adduced testimony from one of its officers to the effect that six months before Standard

---

9. On the basis of this reasoning, Exhibit 93–E, a chart recapitulating rentals lost by the Perkins corporations on subleases to independent operators of service stations, should not have been admitted.

However, evidence showing a decline in gasoline sales by a lessor's tenant on the leased premises was properly admitted as tending to show injury to the lessor's interest in the leased property and the monetary amount of the injury. We note that Exhibits 82–J, L, and M contain general recitals that the computation is of the "Loss in Value of Business" and "Depreciation in going concern value. * * *" Such designations could well mislead a jury; moreover, it appears that the figures included business other than that done at service stations. A lessor has no interest in the business as such and the court should make clear the purpose for which the proof may be considered. Additionally, it appears that no foundation existed for the conclusion of Perkins' expert witness (reflected in the chart) that the sales volume of the leased stations would have progressively increased each year throughout the claim period at a specified rate over the base year but for Standard's asserted discrimination. Such an estimate is competent, but only if based upon facts which fairly permit the opinion.

lowered its price to Signal, he was informed that a competitor, Union Oil Company, had made Signal such an offer and that Standard's reduction which followed was generated by this intelligence. The court refused as irrelevant Standard's offer of sales records from Union's files, dated several months after Standard's price reduction. Despite its *ex post facto* nature, this proof would have afforded the basis for an inference that the prices were those offered during the critical period by Union; thus the records would have served a dual purpose as direct evidence of the Union's prices and to corroborate the testimony of Standard's witness.

Standard makes a more serious objection with reference to the court's instruction on this issue. The jury was told that to establish the affirmative defense the burden was upon Standard to prove its competitor had made "a definite offer" of which it (Standard) was aware. The instruction, standing alone, was clearly erroneous, for the Supreme Court declared in Federal Trade Commission v. A. E. Staley Co., 324 U.S. 746, 759–760, 65 S.Ct. 971, 977, 89 L.Ed. 1338 (1945) that "Section 2(b) does not require the seller to justify price discriminations by showing that in fact they met a competitive price. * * * We agree with the Commission that the statute at least requires the seller, who has knowingly discriminated in price, to show the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally lower price of a competitor." [10]

Other assignments urged by Standard in its brief involve matters not likely to occur during the course of another trial and we therefore, in order to avoid unduly prolonging this opinion, do not discuss them. Our failure to do so, however, is not to be taken as an appellate approval of every ruling not specifically discussed herein.

In view of the outcome of this appeal, all questions concerning attorneys' fees shall await final disposition of the litigation in the district court or this court.

The judgment is reversed and the cause remanded for a new trial on both liability and damages (including the submission of additional or different evidence pertaining thereto), consistent with the views expressed in this opinion. On the matter of liability, however, since Standard has not questioned the trial court's ruling that Perkins and the Perkins corporations were purchasers within the meaning of the Clayton Act, the contention that Perkins was a consignee for commercial purposes and not a purchaser, will not be available to Standard on retrial.

On Petition for Rehearing

Before HAMLEY, KOELSCH and DUNIWAY, Circuit Judges.

Perkins' petition for rehearing is denied. Essentially it is nothing more than a repetition of arguments concerning assignments, which we are satisfied were all adequately considered and correctly passed upon by our written opinion. However, one particular point is not unworthy of brief current comment.

Because Perkins or the Perkins corporations operated or were interested in a few retail service stations, in addition to the wholesale distribution which comprised by far the greater part of their business, we believed it useful to point out that on retrial any recovery on their 2(d) and 2(e) claims for allowances and services proportional to any Standard made to its branded dealers on the retail level should not reflect Perkins' wholesale distribution.

The validity of our cautionary observation that under section 2(d) and its companion 2(e) a seller's obligation for such matters is limited to customers

10. The court also gave an instruction, requested by Standard, which correctly stated the rule.

who compete with each other on the same level of distribution is in no wise weakened by the Supreme Court's recent reversal of F.T.C. v. Fred Meyer, Inc., 359 F.2d 351 (9th Cir. 1966) reversed 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968), the decision upon which we relied. To the contrary, its validity is finally confirmed and settled beyond dispute, for in *Meyer* the court opined:

"We cannot assume without a clear indication from Congress that § 2(d) was intended to compel the supplier to pay the allowances to a reseller further up the distributive chain who might or might not pass them on to the level where the impact would be felt directly. We conclude that the most reasonable construction of § 2(d) is one which places on the supplier the responsibility for making promotional allowances available to those resellers who compete directly with the favored buyer." (p. 357).