481 F.2d 122
 1973-1 Trade Cases 74,540
 In re MULTIDISTRICT VEHICLE AIR POLLUTION M.D.L. NO. 31.
STATE of CALIFORNIA et al., Appellees,
v.
AUTOMOBILE MANUFACTURERS ASSOCIATION, INC., et al., Appellants.
Robert MORGAN, Appellee,
v.
AUTOMOBILE MANUFACTURERS ASSOCIATION, INC., et al., Appellants.
CITY OF PHILADELPHIA et al., Appellees,
v.
AUTOMOBILE MANUFACTURERS ASSOCIATION, INC., et al., Appellants.
STATE of NEW YORK, Appellee,
v.
AUTOMOBILE MANUFACTURERS ASSOCIATION, INC., et al., Appellants.
CITY OF NEW YORK et al., Appellees,
v.
AUTOMOBILE MANUFACTURERS ASSOCIATION, INC., et al., Appellants.
CITY AND COUNTY OF DENVER, Appellees,
v.
AMERICAN MOTORS CORPORATION et al., Appellants.
 No. 71-1241.
 United States Court of Appeals,
Ninth Circuit.
 June 4, 1973.
 
 Robert L. Stern (argued), of Mayer, Brown & Platt, Chicago, Ill., Lloyd N. Cutler (argued), of Wilmer, Cutler & Pickering, Washington, D. C., Walter J. Williams, Detroit, Mich., Forrest A. Hainline, Jr., of Cross, Wrock, Miller & Vieson, Ross L. Malone, Robert A. Nitschke, of General Motors, Detroit, Mich., Richard C. Warmer, of O'Melveny & Myers, Julian O. Von Kalinowski, of Gibson, Dunn, & Crutcher, G. William Shea, Philip K. Verleger, Jack D. Fudge, David A. Destino, of McCutchen, Black, Verleger & Shea, Carl J. Schuck, of Overton, Lyman & Prince, Marcus Mattson, of Lawler, Felix & Hall, Carla H. Hills, Atty., of Munger, Tolles, Hills & Rickershauser, Harvey M. Grossman, of Pacht, Ross, Warne, Bernhard & Sears, Los Angeles, Cal., Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., Alan N. Halkett, of Latham & Watkins, Los Angeles, Cal., John H. Schafer, III, of Covington & Burling, Washington, D. C., for appellants.
 David Berger (argued), Philadelphia, Pa., George C. Mantzoros, Asst. Atty. Gen. (argued), New York City, David I. Shapiro (argued), of Dickstein, Shapiro & Galligan, Washington, D. C., Evelle J. Younger, Atty. Gen., Los Angeles, Cal., Ronald Bloomfield, Atty. Gen., New York City, Anthony C. Joseph, Herbert Davis, Ellen Friedman, Deputy Attys. Gen., Los Angeles, Cal., Edward G. Bauer, Jr., City Sol., Philadelphia, Pa., Max P. Zall, City Atty., Denver, Colo., J. Lee Rankin, Corp. Counsel for the City of New York, Norman Redlich, First Asst. Corp. Counsel, New York City, Harold E. Kohn, Bruce W. Kauffman, Edward F. Mannino, John M. Elliott, of Dilworth, Paxson, Kalish, Levy & Coleman, Herbert B. Newberg, H. Laddie Montague, Jr., Philadelphia, Pa., Perry Goldberg, Chicago, Ill., Leo T. Zuckerman, Denver, Colo., Jerome S. Wagshal, of Dickstein, Shapiro & Galligan, George Kauffman, Washington, D. C., for appellees.
 Before HAMLIN, BROWNING and ELY, Circuit Judges.
 OPINION
 ELY, Circuit Judge:
 
 
 1
 This certified interlocutory appeal under 28 U.S.C. Sec. 1292(b) arises from pretrial proceedings in Multidistrict Air Pollution Control Litigation (C.D.Cal. M.D.L. 31), which is a consolidation of numerous actions[1] under 28 U.S.C. Sec. 1407. In re Motor Vehicle Air Pollution Control Equipment, 311 F. Supp. 1349 (Jud. Panel Mult. Lit. 1970.) Since this appeal is from denial of motions to dismiss, factual allegations are cast most favorably to the appellees. See Conley v. Gibson, 355 U.S. 41, 78 S. Ct. 99, 2 L.Ed.2d 80 (1957).
 
 
 2
 As early as 1953, the nation's automobile manufacturers and their trade association allegedly conspired to eliminate competition among themselves in the research, development, manufacture, installation and patenting of automotive air pollution control devices. Appellees urge that this horizontal antitrust conspiracy was motivated: (1) by appellants' conviction that antipollution devices are externalities, whose development would increase price without concomitant spur to consumer interest; (2) by the apprehension that the first competitor to perfect such a device would garner exclusive contracts with governmental purchasers; and (3) by the fear that technological realization of the devices would prompt laws compelling their use.[2]
 
 
 3
 Appellees argue that this conspiracy inflicted financial losses that would not have occurred but for the conspiracy-induced absence of antipollution equipment. Governmental entity appellees claim losses resulting from diminution in value of, and expenditures in connection with, government property and interests. Crop farmer appellees assert direct damage to crop yields. Variously proceeding in their individual capacities, as parens patriae and as class representatives, all appellees seek treble damages and equitable relief under sections 4 and 16 of the Clayton Act, 15 U.S.C. Secs. 15, 26.
 
 
 4
 On appeal, appellants challenge the District Court's rulings that appellees have standing to sue under sections 4 and 16 of the Clayton Act, that certain appellees may proceed as parens patriae, and that others may proceed as class representatives under Fed.R.Civ.P. 23.
 
 I. STANDING UNDER SECTION 4
 
 5
 Appellees ground their claims for treble damages on section 4 of the Clayton Act, 15 U.S.C. Sec. 15, which reads:
 
 
 6
 "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit including a reasonable attorney's fee."
 
 
 7
 Read literally, this statute could afford relief to all persons whose injuries are causally related to an antitrust violation. Recognizing the nearly limitless possibilities of such an interpretation, however, the judiciary quickly brushed aside this construction.[3] Instead, a measured approach has prevailed; courts have impressed a standing doctrine so as to confine the availability of section 4 relief only to those individuals whose protection is the fundamental purpose of the antitrust laws. Cf. Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Association of Data Processing v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Mount Clemens Industries, Inc. v. Bell, 464 F.2d 339, 341-344 (9th Cir. 1972). Unfortunately, no "bright line" has yet emerged to divine this group, and courts have formulated varied definitions.
 
 
 8
 In this case, however, the District Court declined to apply any of the extant definitions, choosing instead to expand[4] the coverage of section 4:
 
 
 9
 "We are now concerned with the phrase 'injured in his business or property by reason of anything forbidden in the antitrust laws' in the light of the allegations of these complaints, rather than the traditional, legalistic approach defined by the cases cited by defendants in their motion to dismiss. Each of the plaintiffs allege injury to their respective business or property by reason of anti-trust violations of the defendants.
 
 
 10
 "Plaintiffs may fail in their proof, but until then, they should be given the benefit of employing 'any available remedy to make good the wrong done."' [footnote citing J. I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S. Ct. 1555, 12 L.Ed.2d 423 (1964); Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946)].
 
 
 11
 52 F.R.D. 398, 401 (C.D.Cal.1970). In the aftermath of the Supreme Court's recent decision in Hawaii v. Standard Oil Co., 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), however, we cannot so easily disregard the so-called "traditional, legalistic approach" of the cases.
 
 
 12
 Judicial constructions of standing under section 4 have keyed on the phrases "business or property" and "by reason of" as indicating twin requisites for standing. First, a plaintiff must allege injury to his "business or property", a term definitively limited to interests in commercial ventures or enterprises: "the words 'business or property' . . . refer to commercial interests or enterprises." Hawaii, supra at 264, 92 S.Ct. at 892. See Control Data Corp. v. IBM, 306 F.Supp. 839, 845 (D.Minn.1969) (corporate plaintiff not in legal existence at time of antitrust violation is without commercial injury). Secondly, a plaintiff must allege that the injury suffered was occasioned "by reason of" an antitrust violation. Hawaii, supra at 263-264 n.14, 92 S.Ct. 885.
 
 
 13
 Applying the first predicate, since neither the government's individual claims, nor their class claims, nor their parens patriae claims allege any injury to commercial ventures or enterprises, the governmental entities cannot seek recovery under section 4 of the Clayton Act. In contrast, the farmers satisfy the first requisite, since a diminished crop yield, for example, would constitute injury to commercial interests.
 
 
 14
 Application of the second prong of the standing formulation is more difficult since "by reason of" has consistently eluded efforts at uniform definition or application. Compare, e. g., Mulvey v. Samuel Goldwyn Productions, 433 F.2d 1073 (9th Cir. 1970) with Fields Productions, Inc. v. United Artists Corp., 432 F.2d 1010 (2d Cir. 1970), aff'g, per curiam 318 F.Supp. 87 (S.D.N.Y.1969), cert. denied, 401 U.S. 949, 91 S.Ct. 932, 28 L.Ed.2d 232 (1971); and compare Steiner v. 20th Century-Fox Film Corp., 232 F.2d 190 (9th Cir. 1956) and Congress Building Corp. v. Loew's, Inc., 246 F.2d 587 (7th Cir. 1957) with Melrose Realty Co. v. Loew's, Inc., 234 F.2d 518 (3d Cir.), cert. denied, 352 U.S. 890, 77 S.Ct. 128, 1 L.Ed.2d 85 (1956) and Harrison v. Paramount Pictures, Inc., 115 F. Supp. 312 (E.D.Pa.1953), aff'd, 211 F.2d 405 (3 Cir.), cert. denied, 348 U.S. 828, 75 S.Ct. 45, 99 L.Ed. 653 (1954); and compare Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383 (6th Cir. 1962), cert. denied, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963) with South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414 (9th Cir.), cert. denied, 385 U.S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966). The resulting confusion prompted speculation that the Supreme Court would disapprove judicial application of "by reason of" to limit potential antitrust claimants.[5] In Hawaii, however, the Court appeared to approve the standing doctrine to require more from a would-be plaintiff than some remote connection in the causal chain.
 
 
 15
 "The lower courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation."
 
 
 16
 405 U.S. at 263 n.14, 92 S.Ct. at 891-892. Although the Court cited cases in support from every circuit, it failed to distinguish essentially two disparate analytical techniques-the "direct injury" and the "target area" approaches[6]-employed by different circuits.[7]
 
 
 17
 Courts adhering to the "direct injury" test focus principally on the relationship between the alleged antitrust violator and the claimant. Generally, if the claimant is separated from the violator by an intermediate antitrust victim, standing is denied by attaching conclusory labels such as "remote", "indirect", and "consequential". Resurrecting notions of privity, this test thus arbitrarily forecloses otherwise meritorious claims simply because another antitrust victim interfaces the relationship between the claimant and the alleged violator. Moreover, the "direct injury" requirement has engendered among some adherents a regrettable tendency to deny standing to any plaintiff who happens to fall within certain talismanic rubrics: "creditor", "landlord", "lessor", "franchisor", "supplier".[8] This disposition is, we think, unsatisfactory insofar as it transforms judicial inquiry into a mere search for labels.
 
 
 18
 In contrast, courts employing the "target area" approach focus on claimant's relationship to the area of the economy allegedly injured by the defendant.
 
 
 19
 "[T]o state a cause of action under the anti-trust laws a plaintiff must show more than that one purpose of the conspiracy was a restraint of trade and that an act has been committed which harms him. He must show that he is within that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry. Otherwise he is not injured 'by reason' of anything forbidden in the anti-trust laws."
 
 
 20
 Conference of Studio Unions v. Loew's Inc., 193 F.2d 51, 54-55 (9th Cir. 1951), cert. denied, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952). To attain standing, a plaintiff must thus allege that the antitrust violation injured a commercial enterprise of the plaintiff in the area of the economy in which the elimination of competition occurred. Standing is denied, on the other hand, if the claimant's commercial activity occurred outside that area of the economy. See id. Hence the "target area" approach provides a logical and flexible tool for analyzing whether a particular claimant falls within the class of persons slated by Congress for protection under section 4 of the Clayton Act.
 
 
 21
 "[T]he basic and underlying purposes of the anti-trust laws [are] to preserve competition and to protect the consumer. Recovery and damages under the anti-trust law is available to those who have been directly injured by the lessening of competition and withheld from those who seek the windfall of treble damages because of incidental harm."
 
 
 22
 Id. at 55. See Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358, 365 (9th Cir. 1955).
 
 
 23
 The "direct injury" approach to section 4 was implicitly undermined by the Supreme Court in Perkins v. Standard Oil Co., 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969), rev'g 396 F.2d 809 (9th Cir. 1968). Attention centered on whether "fourth level" price discrimination is proscribed by section 2 of the Clayton Act, as amended by section 13 of the Robinson-Patman Act, 15 U.S.C. Sec. 13. A panel of our court, focusing on the indirect commercial relationship between claimant and defendant, had concluded in the negative:
 
 
 24
 "Section 2(a) of the Act does not recognize a causal connection, essential to liability, between a supplier's price discrimination and the trade practices of a customer [removed four rungs] . . . on the distributive [sic] lader . . . ."
 
 
 25
 396 F.2d at 816. In the Supreme Court's reversing opinion, Mr. Justice Black admonished that this direct-indirect "limitation is wholly artificial and is unwarranted by the language or purpose of the Act." He reasoned that "the competitive harm done . . . is certainly no less because of the presence of an additional link in this particular distribution chain from the producer to the retailer." 395 U.S. at 648, 89 S.Ct. at 1874. Though applying a different section of the Clayton Act, the opinion argues forcefully by analogy against "direct injury" analysis. The Court eschewed consideration of the nexus between claimant and defendant and concentrated instead on the nature of the "competitive harm".
 
 
 26
 Direct support of the "target area" approach also emerges from the Supreme Court's opinion in Perkins, supra. The plaintiff had appended an auxiliary claim under section 4 for injuries allegedly suffered in his individual capacities as creditor, landlord, and broker. In constructing its analytical framework, our court unfortunately-but quite understandably[9]-indiscriminately juxtaposed cases espousing both the "direct injury" and the "target area" tests. We resurrected notions of privity, and, attaching the determinative "lessor" label, concluded that the plaintiff's claim was comprised of elements not "properly the subject of damages." 396 F.2d at 815. The Supreme Court's reversal was grounded solely on a "target area" quotation from Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358, 363 (9th Cir. 1955) that the Court applied consistently with its disposition of the section 2 issue. The Court avoided any categorical characterization of claimant as, for example, a "lessor" or a "creditor", and affirmed the propriety of section 4 relief by emphasizing the economic impact of the anticompetitive conduct.
 
 
 27
 Perkins therefore clarifies any ambiguity inhering in Hawaii's failure to adopt expressly either of the two predominant judicial glosses on the language "by reason of". By repudiating all those aspects of the "direct injury" test that distinguish it from the "target area" approach, and by embracing and applying the latter, the Court in Perkins, at least inferentially, impresses its imprimatur upon the "target area" approach articulated by this court: a plaintiff has standing under section 4 of the Clayton Act if the claimed losses fall "within that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry." E. g., Mulvey v. Samuel Goldwyn Productions, 433 F.2d 1073 (9th Cir. 1970); Hoopes v. Union Oil Co., 374 F. 2d 480, 485 (9th Cir. 1967); Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358 (9th Cir. 1955); Conference of Studio Unions v. Loew's Inc., 193 F. 2d 51 (9th Cir. 1951), cert. denied, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952). A proper application of "by reason of" focuses on whether the anticompetitive conduct directed against an area of the economy injured business operations conducted by the claimant in that sector of the economy. The resulting two-step approach first requires identification of the affected area of the economy and then the ascertainment of whether the claimed injury occurred within that area.
 
 
 28
 Here the crop farmers' complaint alleges that the automobile manufacturers conspired
 
 
 29
 "(a) To eliminate all competition among the automobile manufacturers in the research, development, manufacture and installation of motor vehicle air pollution equipment;
 
 
 30
 "(b) To eliminate competition . . . in the purchase of patents and patent rights from other parties covering motor vehicle air pollution equipment."
 
 
 31
 It is manifest from these averments that the area of the economy against which anticompetitive conduct was allegedly directed was that concerned with research, development, manufacture, installation and patenting of automotive air pollution control devices.[10] No commercial interest of the crop farmers falls within this area. Not only were the crop farmers not targets of the alleged conspiracy, they were not even on the firing range. Accordingly, the farmers lack standing under section 4 of the Clayton Act,[11] to maintain this action. Upon remand, therefore, all actions arising under section 4 will be dismissed.
 
 
 32
 Insofar as the common weal was injured the federal government was the proper party to seek redress; and, in fact, it attempted to do so. See Note 1, supra. If the Government did not prosecute its action with sufficient vigor, the remedy lies in executive or legislative reform, not in judicial overreaching.
 
 II. STANDING UNDER SECTION 16
 
 33
 Appellees' claims for injunctive relief are based on section 16 of the Clayton Act, 15 U.S.C. Sec. 26, which reads in relevant part:
 
 
 34
 "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings . . . ."
 
 
 35
 As the Court noted in Hawaii, supra, 405 U.S. at 260, 92 S.Ct. 885, 31 L.Ed.2d 184, this section varies significantly from section 4 insofar as the broader language of section 16 lacks mention of "business or property", an omission signalling different standing requirements. This treatment is fully justified by the difference between the remedies available under each section. In contrast to section 4, section 16 does not involve punitive and potentially disastrous judgments for treble damages and attorneys' fees,[12] neither is there the potential threat of duplicative recoveries. See Hawaii, supra at 261-264. Consequently, courts have not exercised the same pronounced restraint in granting standing under section 16 as they have done under section 4. As we observed in Hawaii v. Standard Oil Co., 431 F.2d 1282, 1284-1285 (9th Cir. 1970), aff'd, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972):
 
 
 36
 "[Section 16] is far broader than Sec. 4. Any person may secure injunctive relief against threatened loss or damage by violation of the antitrust laws. Section 4 provides for recovery of treble damages only by a person injured in his business or property by [reason of] such a violation."
 
 
 37
 Unlike standing under section 4, standing under section 16 does not require an injury to "commercial interests" but only an injury cognizable in equity. For example, housing segregations enforced by an antitrust conspiracy of realtors constitutes an injury to excluded minority members that confers standing for injunctive relief under section 16, see Bratcher v. Board of Realtors, 381 F.2d 723 (6th Cir. 1967), although not for treble damages under section 4. Since all appellees herein have alleged "threatened loss or damage" to interests cognizable in equity,[13] they have standing to seek equitable protection under section 16 of the Clayton Act.
 
 
 38
 We emphasize that we now intimate no conclusions as to either the merits of the equitable claims or the availability of any form of injunctive relief. These issues must, in the first instance, be resolved by the District Court.
 
 III. PARENS PATRIAE
 
 39
 At common law, the concept of parens patriae invested the English Sovereign with powers and duties-the "royal prerogative"-to protect certain interests of his subjects. See Hawaii, supra, 405 U.S. at 257-260, 92 S.Ct. 885. In this country the parens patriae function expanded somewhat and devolved upon the states that, to some extent, ceded it to the federal government. See Massachusetts v. Mellon, 262 U.S. 447, 485-486, 43 S.Ct. 597, 67 L.Ed. 1078 (1923); Public Utilities Commission v. United States, 356 F.2d 236, 241 n.1 (9th Cir.), cert. denied, 385 U.S. 816, 87 S.Ct. 35, 17 L.Ed.2d 54 (1966). Hence, the federal government and the states, as the twin sovereigns in our constitutional scheme, may in appropriate circumstances sue as parens patriae to vindicate interests of their citizens. E. g., Hawaii, supra; Georgia v. Pennsylvania Railroad Co., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945); North Dakota v. Minnesota, 263 U.S. 365, 44 S.Ct. 138, 68 L.Ed. 342 (1923); Pennsylvania v. West Virginia, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923); New York v. New Jersey, 256 U.S. 296, 41 S.Ct. 492, 65 L. Ed. 937 (1921); Georgia v. Tennessee Copper Co., 206 U.S. 230, 27 S.Ct. 618, 51 L.Ed. 1038 (1970); Kansas v. Colorado, 206 U.S. 46, 27 S.Ct. 655, 51 L.Ed. 956 (1907); Missouri v. Illinois, 180 U.S. 208, 21 S.Ct. 331, 45 L.Ed. 497 (1901); Louisiana v. Texas, 176 U.S. 1, 20 S.Ct. 251, 44 L.Ed. 347 (1900). On the other hand, political subdivisions such as cities and counties, whose power is derivative and not sovereign, cannot sue as parens patriae, although they might sue to vindicate such of their own proprietary interests as might be congruent with the interests of their inhabitants.
 
 
 40
 We have already concluded that, inasmuch as appellee states failed to allege any injury to their "commercial interests", they lack standing qua parens patriae, or in any other capacity, to seek relief under section 4 of the Clayton Act. Moreover, our court has recently held that a state cannot sue as parens patriae under section 4 on behalf of its citizen-consumers for injuries suffered by them. California v. Frito-Lay, Inc., 474 F.2d 774 (9th Cir. 1973). Their parens patriae suit under section 16 of the Clayton Act, however, presents a separate but readily manageable issue.
 
 
 41
 In Georgia v. Pennsylvania Railroad Co., supra, the Supreme Court upheld Georgia's parens patriae action under section 16 for an injunction against a conspiracy between large railroad companies. The analysis of that case rendered in Hawaii, supra, 405 U.S. at 259-260, 92 S.Ct. 885, bespeaks the continuing availability of parens patriae actions under section 16 for injunctive relief for injuries to a state's economy. Insofar as the state appellees have alleged injury to their economies, they have standing under section 16. In reaffirming this principle, we quote the presaging language of Mr. Justice Holmes:
 
 
 42
 "[T]he State has an interest independent of and behind the title of its citizens, in all the earth and air within its domain. It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air.
 
 
 43
 ____
 
 
 44
 * * *
 
 
 45
 "It is a fair and reasonable demand on the part of a sovereign that the air over its territory should not be polluted . . . that the forests on its mountains . . . should not be further destroyed or threatened . . . that the crops and orchards on its hills should not be endangered . . . ."
 
 
 46
 206 U.S. at 237-38, 27 S.Ct. at 619.IV. CLASS ACTIONS
 
 
 47
 In light of our determination that all appellees lack standing to seek antitrust damages, the District Court must reevaluate the propriety, under Fed.R.Civ.P. 23(b)(3), of the class actions for equitable relief.[14] In addition, the court may need to examine the applicability of Fed.R.Civ.P. 23(b)(2). Both in anticipation of probable changes among the parties plaintiff, and in deference to the accumulated experience of district courts in framing classes under Rule 23, we deem it inappropriate at this juncture to comment further upon the class action issues.
 
 
 48
 Affirmed in part; reversed and remanded in part.
 
 
 
 [1]
 These are the progeny of a civil antitrust action filed by the federal government against the largest domestic automobile manufacturers and the Automobile Manufacturers' Association. In October of 1969, the Government accepted a consent decree, United States v. Automobile Mfgrs. Ass'n, 307 F.Supp. 617 (C.D.Cal. 1969) aff'd per curiam sub nom. New York v. United States, 397 U.S. 248, 90 S.Ct. 1105, 25 L.Ed.2d 280 (1970), the text of which is reported in 1969 Trade Cas. p72,907
 Similar factual claims were presented to the original jurisdiction of the Supreme Court in Washington v. General Motors Corp., 406 U.S. 109, 92 S.Ct. 1396, 31 L.Ed.2d 727 (1972). After the Court declined to assume jurisdiction in that case, and after this court accepted certification of the present appeal, an additional spate of actions was filed in the District Court under the multi-district tag-along procedures.
 
 
 [2]
 Such compulsion would be unattractive to manufacturers insofar as required use of an externality would likely increase price while not necessarily increasing demand, thus diminishing overall product marketability and profit
 
 
 [3]
 See, e. g., Loeb v. Eastman Kodak Co., 183 F. 704 (3d Cir. 1910) (limiting standing under section 7 of the Sherman Act, predecessor of section 4 of the Clayton Act). Cf. Southern Pacific Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 534, 38 S.Ct. 186, 62 L.Ed. 451 (1918) (Holmes, J.) ("the endlessness and futility of the effort to follow every transaction to its ultimate result"). See also L. Green, The Rationale of Proximate Cause 122-23, 195-97 (1927); Pollock, The "Injury" and "Causation" Elements of a Treble-Damage Antitrust Action, 57 Nw.U.L.Rev. 691, 697-700 (1963)
 
 
 [4]
 Even some commentators who have lauded the ingenuity of the district court's decision recognize its clear departure from prior law. See, e. g., 12 B.C.Ind. & Com. L.Rev. 686 (1971); Note, 24 Vand.L.Rev. 126 (1970)
 
 
 [5]
 See, e. g., Klingsberg, Bull's Eyes & Carom Shots, XVI Antitrust Bull. 351, 368-69 (1971)
 
 
 [6]
 We have employed the terms "target area" and "direct injury" only as convenient, shorthand methods of identifying the two major approaches to the interpretation of "by reason of". Use of either label in other cases, in contrast, has frequently suggested an approach opposite that so denominated here. E. g., Perkins v. Standard Oil Co., 396 F.2d 809 (9th Cir. 1968) (court labeled approach "target area" but employed the "direct injury" analysis), rev'd, 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969). Likewise, some courts have failed to perceive significant distinctions between the tests. E. g., Nationwide Auto Apprasier Serv., Inc. v. Ass'n of Cas. & Sur. Cos., 382 F.2d 925 (10th Cir. 1967). It is to be hoped that the resolution suggested in our present opinion will obviate the use of either label in the future
 
 
 [7]
 We do not mean to imply that each circuit falls neatly into one of the two pigeonholes. Only the Eighth Circuit and ours, for example, have consistently followed the "target area" approach, e. g., Mulvey v. Samuel Goldwyn Productions, 433 F.2d 1073 (9th Cir. 1970); Sanitary Milk Producers v. Bergjans Farm Dairy, Inc., 368 F.2d 679, 688-689 (8th Cir. 1966) (Blackmun, J.), and even they have diverged occasionally. E. g., Perkins v. Standard Oil Co., supra note 6. The First, Third, Sixth and Tenth Circuits, on the other hand, generally apply the test we label "direct injury". E. g., Reibert v. Atlantic Richfield Co., 471 F.2d 727 (10th Cir. 1973); Kauffman v. Dreyfus Fund, 434 F.2d 727, 732-734 (3d Cir. 1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971); Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383, 394-395 (6th Cir. 1962); Miley v. John Hancock Mut. Life Ins. Co., 148 F.Supp. 299 (D.Mass.), aff'd per curiam, 242 F.2d 758 (1st Cir.), cert. denied, 355 U.S. 828, 78 S.Ct. 38, 2 L.Ed.2d 41 (1957). The Second, Fourth and Fifth Circuits have formulated their own particular mixtures of the two tests, e. g., Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc., 454 F.2d 1292 (2d Cir. 1971); Dailey v. Quality School Plan, Inc., 380 F.2d 484 (5th Cir. 1967); South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414 (4th Cir. 1966), although the approach of the Second more closely resembles the "direct injury" test and that of the Fourth and Fifth, the test of "target area". The Seventh Circuit's approach is uncertain, although it appears closer to "target area". Compare Sandidge v. Rogers, 256 F.2d 269 (7th Cir. 1958) with Congress Building Corp. v. Loew's, Inc., 246 F.2d 587 (7th Cir. 1957). In ascribing positions to the various circuits, we have ignored self-descriptions and have attempted to analyze their actual approaches
 
 
 [8]
 See, e. g., Kauffman v. Dreyfus Fund, 434 F.2d 727 (3d Cir. 1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1190, 28 L. Ed.2d 323 (1971) ("shareholder"); Nationwide Auto Appraiser Serv., Inc. v. Ass'n of Cas. & Sur. Cos., 382 F.2d 925 (10th Cir. 1967) ("franchisor"); Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383 (6th Cir. 1962) ("supplier"); Miley v. John Hancock Mut. Life Ins. Co., 242 F.2d 758 (1st Cir.), aff'g per curiam 148 F.Supp. 299 (D. Mass.), cert. denied, 355 U.S. 828, 78 S.Ct. 38, 2 L.Ed.2d 41 (1957) ("creditor"); Melrose Realty Co. v. Loew's, Inc., 234 F.2d 518 (3d Cir.), cert. denied, 352 U.S. 890, 77 S.Ct. 128, 1 L. Ed.2d 85 (1956) ("owner-lessor")
 
 
 [9]
 See, e. g., South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414 (4th Cir.), cert. denied, 385 U.S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966)
 
 
 [10]
 Examples of plaintiffs falling within one or more of these markets, as appellants concede, include an alleged inventor and a manufacturer of motor vehicle air pollution control equipment who claim losses from asserted inability to market their devices
 
 
 [11]
 "Standing" under section 4 actually encapsulizes two distinct ingredients. First, a plaintiff must demonstrate that the interests allegedly injured by the defendant fall within the scope of antitrust protection. This requirement, which arises from judicial constructions of "business or property" and "by reason of", is satisfied in the manner set forth in our opinion. A second and distinct ingredient demands that a plaintiff show that the defendant's conduct contributed to his injury. This cause-in-fact requirement also derives from "by reason of". Once these two standing issues are resolved in favor of a plaintiff, the court can proceed to determine if the defendant's conduct violated the antitrust laws and, then, to ascertain the consequent damages
 
 
 [12]
 In antitrust suits, allowance of attorneys' fees is limited to that proportion of the fee attributable to a successful suit for damages. If only equitable relief is sought or obtained, counsel fees are generally not awarded to a successful plaintiff. See Trans World Airlines, Inc. v. Hughes, 312 F.Supp. 478, 482 (S.D. N.Y.1970) (dictum) modified on other grounds and aff'd, 449 F.2d 51 (2d Cir. 1971), rev'd on other grounds, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973); Union Leader Corp. v. Newspapers of New England, Inc., 218 F. Supp. 490, 491 (D.Mass.1963) (dictum), vacated on other grounds, 333 F.2d 798 (1st Cir.), cert. denied, 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343 (1964); Decorative Stone Co. v. Building Trades Council, 23 F.2d 426, 428 (2d Cir. 1928); Ring v. Spina, 84 F.Supp. 403, 408 (S. D.N.Y.1949) (dictum); Alden-Rochelle, Inc. v. American Society of Composers, Authors & Publishers, 80 F.Supp. 888, 899-900 (S.D.N.Y.1948). But cf. Hall v. Cole, 412 U.S. 1, 93 S.Ct, 1943, 36 L.Ed.2d 702 (1973) (dictum)
 
 
 [13]
 See, e. g., Georgia v. Pennsylvania R. R., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945); Georgia v. Tennessee Copper Co., 206 U.S. 230, 27 S.Ct. 618, 51 L.Ed. 1038 (1907)
 
 
 [14]
 While we do not reach the issues of predominance or manageability under Rule 23(b)(3), we note that problems could have arisen in that respect. See Eisen v. Carlisle & Jacquelin, 479 F.2d 1005 (2d Cir. 1973). Compare, e. g., Chicken Delight, Inc. v. Harris, 412 F.2d 830 (9th Cir. 1969) with Siegel v. Chicken Delight, Inc., 271 F.Supp. 722 (N.D.Cal.1967). Of particular concern might have been the putative class of farmers, over 115,000 in number, who produce a variety of crops in differing localities and conditions throughout the United States. Cf. Diamond v. General Motors Corp., 20 Cal.App.3d 374, 97 Cal.Rptr. 639 (Ct.App.1971). See generally Wright & Miller, 7A Federal Practice and Procedure: Civil Sec. 1781 (1972)