**NASSAU SPORTS, a Limited Partnership, Plaintiff,**

v.

**Edward HAMPSON and Midwest Saints, Inc., d/b/a the Minnesota Fighting Saints, Defendants.**

**No. 4–72–Civ. 466.**

United States District Court,
D. Minnesota,
Fourth Division.

Oct. 11, 1972.

Sherman Winthrop and Robert R. Weinstine, Oppenheimer, Brown, Wolff, Leach & Foster, St. Paul, Minn., for plaintiff.

Vance K. Opperman, Doherty, Rumble & Butler, St. Paul, Minn., for defendants.

## MEMORANDUM

LARSON, District Judge.

Plaintiff Nassau Sports seeks a preliminary injunction prohibiting defendant Hampson from playing hockey, or being otherwise employed by defendant Midwest Saints, Inc., and also prohibiting the Midwest Saints from alleged interference with the contractual relations of plaintiff and Hampson.

Defendant Hampson is a professional hockey player. He is a signatory with the Northstar Financial Corporation (the owner of the Minnesota North Stars Hockey Club) to a "National Hockey League, Standard Player's Contract." The contract is dated July 30, 1971, and by its terms runs from October 1, 1971, until October 1, 1972. Clause 11 of that contract permits the assignment of Hampson's professional services by the North Stars to "any other professional hockey club."

On June 6, 1972, the services of Hampson were assigned by the North Stars to the New York Islanders Hockey Club, owned by plaintiff Nassau Sports. Subsequent to his assignment by the North Stars to the Islanders, Hampson was contacted by the Islanders' general manager, William Torrey. Hampson and his wife traveled to New York, at the expense of the Islanders, to seek housing and to discuss the question of Hampson's salary.

On August 10, 1972, Hampson signed a *contract with the Midwest Saints.* The Saints are a member of the newly formed World Hockey Association. The contract is for a four year period beginning October 1, 1972.

Hampson's contract with the Midwest Saints is in conflict with his contract with the North Stars (that contract since assigned to plaintiff Islanders). The conflict arises from Clause 17 of Hampson's contract with the North Stars, which clause states Hampson's obligation to the North Stars subsequent to the period of time covered by the contract within which it is contained. Clause 17 provides:

"The Club agrees that it will on or before September 1st next following the season covered by this contract tender to the Player personally or by mail directed to the Player at his address set out below his signature hereto a contract upon the same terms as this contract save as to salary.

"The Player hereby undertakes that he will at the request of the Club enter into a contract for the following playing season upon the same terms and conditions as this contract save as to salary which shall be determined by mutual agreement."

Plaintiff seeks, by way of preliminary injunction here, relief from the breach by Hampson of his obligation under the above quoted Clause 17, as the benefits of that clause accrue to plaintiff by way of the assignment of Hampson's services made to it under Clause 11. The defendants respond by alleging that the contractual obligations of Hampson, as asserted by plaintiff, are unenforceable.

■ The Court's consideration of whether to grant the preliminary injunction sought by plaintiff is limited to determining if four tests are satisfied by the showing of plaintiff. Behagen v. Intercollegiate Conference of Faculty Representatives, 346 F.Supp. 602 (D. Minn.1972); Northwest Airlines, Inc. v. Airline Pilots Ass'n, 325 F.Supp. 994 (D.Minn.1970); Van Hoven Co. v. Stans, 319 F.Supp. 180 (D.Minn.1970). These tests are:

1. Has the plaintiff shown substantial probability of success at trial on the merits?

2. Has the plaintiff shown irreparable injury?

3. Will the interests of the other party be substantially impaired by issuance of such an Order?

4. How will the public interest be affected?

■ Plaintiff's first argument for its probability of success at trial on the merits is that Hampson's conduct constitutes breach, prior to October 1, 1972, of a contract valid and enforceable prior to that date, and therefore the validity of the renewal clause (Clause 17 set out above) is not in issue. The argument that Clause 17 is not a factor in determining the likelihood of plaintiff's success at trial on the merits may be disposed of summarily. That the validity of Clause 17 is in issue here is apparent from plaintiff's request for injunctive relief covering a period of time subsequent to the expiration of Hampson's contract with the North Stars. Were it not for renewal by way of Clause 17,

Hampson's contractual obligations to the North Stars, upon which plaintiff here relies, would be nonexistent after October 1, 1972. Because plaintiff seeks relief for a period of time subsequent to October 1, 1972, the validity of Clause 17 is plainly in issue.

Plaintiff's second ground for its contention that it will succeed at trial on the merits is that the renewal or option clause contained in Clause 17 of the contract is valid and enforceable.

The nature and effect of Clause 17 is critical to a determination of whether plaintiff has shown probable success at trial on the merits. It was the position of counsel for plaintiff on oral argument that the effect of Clause 17 is to bind the parties to the contract to further obligations for a period one year following the expiration of the original contract. Defendant contends, however, that the effect of Clause 17 is to act as a contract in perpetuity by reason of the fact that the obligation of Clause 17 is to sign a contract for another year on "the same terms," including Clause 17 itself.

There is apparent to the Court no reason why Clause 17 can be considered anything but a requirement of perpetual contracting for succeeding one year periods. Given this finding of the import of Clause 17, the Court is compelled to conclude that plaintiff has not shown the probability of its success at trial on the merits. The Court must so conclude because Clause 17 seems, plausibly, one aspect of a contractual scheme constituting a violation of sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C.A. §§ 1 and 2. Were Clause 17 shown, at trial on the merits, to be violative of the Sherman Antitrust Act, the plaintiff would not be successful at such trial on the merits.

The perpetual contracting requirement of Clause 17 appears in the context of contractual arrangements governing the entire National Hockey League (NHL). By reason of the organic documents governing the member teams of the NHL,

of which Clause 17 is an integral part, there would seem to be grounds upon which a violation of Sections 1 and 2 of the Sherman Antitrust Act could be made out. The Court notes that the United States District Court for the District of Massachusetts has so concluded. In an opinion dated September 28, 1972, that Court stated, in reference to Clause 17, and the context in which it appears:

"In light of the fact that this complex system dominates and controls a hockey player's career all of his hockey-playing life as a practical matter, it would be unrealistic to rule that the Bruins have sustained their burden of showing that there is a probability that this tangled web of legal instruments will not be found to restrain trade in professional hockey." Boston Professional Hockey Ass'n v. Cheevers and Sanderson, 348 F.Supp. 261 (D. Mass.1972).

The Court in *Cheevers* and *Sanderson* had before it more extensive evidence as to the total nature of the control exercised by the NHL over players and professional hockey generally than has been offered here. However, this Court does have before it an affidavit of defendant Hampson in which is detailed his experience as a player under the standard form contract of the NHL. The conclusion of the Court in *Cheevers* and *Sanderson*, noted above, is supported by the following language from the affidavit of defendant Hampson:

"The common understanding among all the Players I knew and my understanding of the reserve clause was that a player had to sign a new contract before he could play a game in the new season. Once he signed such a contract, he was obligated to sign another contract the next year. If a player did not sign, he would never be able to play hockey anywhere in the United States or Canada. It was my further understanding that as a player, I had no choice where to go,

with whom to play, or when my playing career would be over."

The quoted language is, obviously, not dispositive of the question of whether a violation of sections 1 and 2 of the Sherman Antitrust Act can be made out, but standing in the record uncontroverted, as it does, it is the conclusion of this Court that plaintiff's probable success at trial on the merits has not been shown.

Because the Court has concluded that plaintiff has failed to sustain its burden of showing substantial probability of success on the merits the preliminary injunction sought will not issue. There remain, for application to the facts of this case, the three other tests employed in the determination of whether to grant a preliminary injunction.

The test of whether plaintiff has shown irreparable injury is the only test which has been satisfied by the showing of plaintiff. Plaintiff has shown, and the Court finds, that defendant Hampson is a skilled professional hockey player, that defendant Hampson acknowledged in his contract with the North Stars that his services were unique and that it is impossible for plaintiff, given Hampson's refusal to play hockey for plaintiff, to acquire precisely the same services. The Court concludes, from these findings, that plaintiff has lost the unique services of Hampson and that such loss represents irreparable injury.

The test of whether the interests of the other party, here Hampson and the Midwest Saints, will be substantially impaired by the issuance of the requested preliminary injunction has not been met by plaintiff. The Court finds that Hampson is a professional hockey player who supports himself and his family by playing hockey and that he and his family are residents of Minnesota. The Court also finds that defendant Midwest Saints is a new professional hockey team in a new professional hockey league. From these findings the Court concludes that the interest of Hampson in supporting himself and his family in their Minnesota residence by playing professional

hockey would be substantially impaired were the Court to grant the preliminary injunction sought by plaintiff, in that such injunction would prohibit Hampson from playing hockey for the Midwest Saints of St. Paul. On the same findings the Court also concludes that the interests of the Midwest Saints would be substantially impaired were it precluded, by the requested injunction, from the benefits of Hampson's professional services for the conduct of its business.

The test of how the public interest will be affected by the issuance of the requested injunction has also not been met by plaintiff. The Court finds that both plaintiff and the Midwest Saints are new teams which have never played a full season and that the Midwest Saints are within the structure of a new league for competition in professional hockey which league is undertaking competition with the established league of which plaintiff is a new member. From these findings the Court concludes that there are two elements of public interest affected by the requested injunction. The first element of public interest is the benefit accruing to the fans of both plaintiff and defendant Saints in observing Hampson play hockey. The public interest as represented by the enjoyment of plaintiff's fans and defendant Saints' fans would seem to be equally balanced. The second element of public interest is the entry into the market of a new league. It would seem to the Court that, as to this element, the public interest would be better served by the entry of a new league into the professional hockey market. The Court so concludes on the ground that the entry of the new league into the market will increase economic competition between commercial enterprises engaged in interstate commerce. The plaintiff has not, therefore, satisfied this last test.

In sum, the Court must deny the application of plaintiff for a preliminary injunction because plaintiff has failed to satisfy three of the four tests required for the issuance of a preliminary injunction.