LOS ANGELES MEMORIAL COLISEUM
COMMISSION, Plaintiff,

v.

NATIONAL FOOTBALL LEAGUE et
al., Defendants.

No. 78–3523–HP.

United States District Court,
C. D. California.

Feb. 28, 1979.

As Amended May 16, 1979.

156

Blecher, Collins & Hoecker by Maxwell M. Blecher, Gary W. Hoecker, Los Angeles, Cal., for plaintiff.

O'Melveny & Myers by B. Boyd Hight, Clark Waddoups, Los Angeles, Cal., for all defendants except L. A. Rams Football Co. & Chargers Football Co.

Rosenfeld, Meyer & Susman by Gary A. Schlessinger, Beverly Hills, Cal., for L. A. Rams Football Co.

## MEMORANDUM AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS WITH LEAVE TO AMEND AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

PREGERSON, District Judge.

This case requires the court to examine certain provisions of the constitution and by-laws of a professional sports league in the context of the nation's antitrust laws. Plaintiff, the Los Angeles Memorial Coliseum Commission ("Coliseum") contends that the National Football League ("NFL") and its twenty-eight member teams stand in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Specifically, the Coliseum challenges the validity of sections 3.1 and 4.3 of the NFL's Constitution and By-laws, which require an affirmative vote of three-fourths of the team owners before a member club may transfer its franchise from one city to another or before a new member club may be admitted into the NFL.[1] The Coliseum seeks to enjoin defendants, under § 16 of the Clayton Act, 15 U.S.C. § 26, from enforcing sections 3.1 and 4.3.

The NFL, an unincorporated association, and its twenty-eight member teams are engaged in the business of producing public

---

1. Section 3.1(b) provides: "The admission of a new member club . . . shall require the affirmative vote of three-fourths of the existing member clubs of the League."

Section 4.3 provides: "No member club shall have the right to transfer its franchise or playing site to a different city . . . without prior approval by the affirmative vote of three-fourths of existing member clubs of the League."

entertainment in the form of professional football games. The NFL is the only "major league" professional football organization operating in the United States. Each team, which is separately owned, is located in a particular city and plays all of its "home games" in that city. Though the teams do not pool profits or generally share expenses,[2] they do act concertedly by cooperating with each other in a number of significant ways. Pursuant to the NFL's Constitution and By-laws, this cooperation includes promulgating uniform playing rules, organizing and scheduling games, sharing television revenues and ticket receipts, and administering a joint player selection system (the "draft") whereby negotiating rights to college and other non-NFL football players are allocated among the teams. In addition, when the NFL expands and accepts a new team into the League, existing clubs help stock the expansion franchise by making players available from their own rosters. Sections 3.1 and 4.3, challenged in this action, represent two other ways in which the teams have chosen to act concertedly.

This lawsuit arose because of the decision by the Los Angeles Rams football team, a member of the NFL, to discontinue playing home games in the Coliseum and instead to play them in Anaheim, a city located south of Los Angeles in Orange County, California. The change will be effective as of the 1980–81 football season. Thus, as matters now stand, the 1980–81 season will find the Coliseum without a professional football team for the first time since 1946, when the Rams started to play there. Because the Rams' departure will allegedly lead to a loss of revenue and other financial injury, and because the Coliseum believes that the County of Los Angeles should have a professional football team, the Coliseum now wishes to obtain another NFL team to replace the Rams. This replacement team could either be an existing team now located in another city, or could be a new team created by the NFL. The three-fourths vote requirement embodied in sections 3.1 and 4.3, however, looms as an obstacle blocking the attainment of the Coliseum's desires—an obstacle the Coliseum would like struck down.[3]

Before the court are defendants' motions to dismiss for lack of standing and justiciability,[4] and the Coliseum's motion for partial summary judgment under § 1 of the Sherman Act. After considering the pleadings, the memoranda of law, the affidavits of William R. Robertson, Gary W. Hoecker, and Pete Rozelle, and the oral argument of counsel, the court rules that the motions to dismiss should be granted with leave to amend and that the motion for partial summary judgment should be denied.

## I. Motions to Dismiss

The NFL and its member teams assert in companion motions to dismiss that the Coliseum lacks standing to bring this action and that this matter is not justiciable. The standing and justiciability issues overlap to a significant degree and so will be considered together, under the rubric of standing.

In resolving the standing question, the court's lodestar must be the language of

---

**2.** The teams do share the expense of the League office and engage in joint promotional activities.

**3.** The Coliseum alleges that sections 3.1 and 4.3 of the NFL's Constitution and By-laws "have had, and continue to have, the direct effect of precluding and impeding plaintiff from successfully conducting . . . negotiations with the owners of NFL franchises for the relocation of such a franchise to Los Angeles." Supplemental and Amended Complaint for Injunctive Relief under the Antitrust Laws, ¶ 19 at 9. The Coliseum further alleges that these provisions "preclude and impede plaintiff from initiating efforts to have established a new NFL franchise for Los Angeles." Id.

**4.** The Chargers Football Company (San Diego Chargers) has not filed an answer to the complaint, has not joined in the motions to dismiss filed by the other defendants, and has not joined in opposing the motion for partial summary judgment filed by the Coliseum. At oral argument on January 8, 1979, the court was informed that, as of that date, the Chargers had not yet been served with a copy of the summons and complaint.

§ 16 of the Clayton Act, 15 U.S.C. § 26. Section 16, in relevant part, provides:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings . . . .

The key Ninth Circuit decision construing § 16 is *In re Multidistrict Air Pollution M.D.L. No. 31*, 481 F.2d 122 (9th Cir.), *cert. denied*, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973) *("Vehicle Air Pollution")*. In *Vehicle Air Pollution*, the court found that plaintiffs, who were crop farmers, had standing to seek injunctive relief under § 16. The gist of the farmers' antitrust complaint was that the nation's automobile manufacturers had conspired to eliminate competition in the research, development, manufacture, installation, and patenting of automobile air pollution control devices; that this conspiracy had retarded the development of such devices; and that as a result thereof the farmers had suffered lower crop yields because of additional air pollution.

## A. *Injury to Plaintiff*

■ The Ninth Circuit in *Vehicle Air Pollution* held that a plaintiff must allege an injury cognizable in equity to gain standing under § 16. The farmers in that case met this requirement by alleging that defendants' antitrust violations had caused diminished crop yields. In the case at hand, the Coliseum alleges that it faces a loss of revenue resulting from the relocation of the Rams to Anaheim and the Coliseum's asserted inability to procure a transfer or an expansion team because of the obstacles created by the challenged sections of the NFL's Constitution and By-laws. This alleged loss of revenue is analogous to the farmers' loss of revenue due to diminished

crop yields and is an injury cognizable in equity.

The NFL and its member teams contend, nevertheless, that the Coliseum has not alleged a sufficiently immediate injury to satisfy the "case or controversy" requirement of Article III of the Constitution. "The injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1973). Defendants point out that the Coliseum's alleged loss of revenue, resulting from its loss of a professional football team as a tenant, will not occur—if at all—until well over a year from now. It is possible, defendants argue, that before the 1980–81 football season dawns, the NFL clubs will vote either to allow an existing team to move to the Coliseum or to allocate an expansion team for Los Angeles and the Coliseum. As of now, no votes, either affirmative or negative, have been taken. In a nutshell, the defendants say that nothing actually has happened and that the Coliseum is merely seeking an advisory opinion from this court.

■■ Defendants' argument is clearly at odds with the language of § 16 of the Clayton Act. Section 16 specifically declares that a plaintiff may sue for "threatened loss or damage." As the Supreme Court held in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969):

> [Section 16] authorizes injunctive relief upon the demonstration of "threatened" injury. That remedy is characteristically available even though the plaintiff has not yet suffered actual injury . . . ; he need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur. [Footnote omitted.]

Plainly, this suit need not be postponed by the Coliseum until it actually suffers injury by finding itself at the commencement of the 1980-81 season without the Rams or any other professional football team as a tenant.

■ *Zenith Radio* teaches that not only must there be a threat of injury, but that the threat must be significant for injunctive relief to be granted. To satisfy the requirement of significant threat of injury and to withstand a motion to dismiss for lack of standing the Coliseum must allege: 1) that the Rams will cease playing home games at the Coliseum as of the 1980–81 season; and 2) that it is reasonably likely that, before the start of the 1980–81 season, the NFL clubs will not approve the transfer of an existing team to the Coliseum or the placement of an expansion team there.

Defendants assert, however, that these two allegations describe a threatened injury too speculative to pass the "case or controversy" test. They rely principally on the abortion decision, *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). In *Roe,* although the wife was not pregnant and thus not immediately faced with a denial of an abortion, a married couple sought to challenge Texas statutes that generally prohibited abortions. The Supreme Court held that the couple lacked standing because their injury was too speculative and indirect. "Their alleged injury [the denial of an abortion] rests on possible future contraceptive failure, possible future pregnancy, possible future unpreparedness for parenthood, and possible future impairment of health." *Id.* at 128, 93 S.Ct. at 714.

The situation in the instant case is a far-cry from that presented in *Roe.* The Supreme Court's decision in *Roe* seems to rest on the belief that the contingencies present in that case had only a slight chance of occurring. Here, two things must happen before the Coliseum suffers actual injury, but one of these—the Rams' move to Anaheim—cannot be considered a contingency since both sides agree that it will in fact occur. With respect to the remaining contingency—the possible negative vote of the NFL owners on the question of a new team for Los Angeles—it has, to say the least, some fair chance of occurring.[5] Thus, the Coliseum's threatened injury cannot be considered speculative or indirect.

Therefore, the Coliseum can satisfy the injury requirement of the § 16 standing test by making the allegations, numbered one and two, set forth above. The complaint does allege that the Rams will leave the Coliseum as of the 1980–81 season. But that pleading does not allege the second element—that it is reasonably likely that, prior to the 1980–81 season, the NFL clubs will not approve the transfer of an existing team to the Coliseum or the placement of an expansion team therein. Therefore, the motion to dismiss must be granted with leave to amend.

## B. *Proximate Cause*

■ The requirement of proximate cause limits the class of persons granted judicial relief by precluding certain persons from obtaining any recovery, even though their injuries were caused by defendant's violation of a duty. As Dean Prosser aptly put it:

> [Proximate cause] is sometimes said to be a question of whether the conduct has been so significant and important a cause that the defendant should be legally responsible. But both significance and importance turn upon conclusions in terms of legal policy, so that this becomes essentially a question of whether the policy of the law will extend the responsibility for

---

5. As to whether the contingency remaining in this case has a sufficient change of occurring, the situation here, rather than being akin to *Roe,* seems to be closer to *Industrial Communications Systems, Inc. v. Pacific Telephone & Telegraph Co.,* 505 F.2d 152 (9th Cir. 1974). There the Ninth Circuit found a sufficient allegation of threatened injury under § 16 where two contingencies stood between the threat and the occurrence of injury. The complaint alleged that defendants Pacific Telephone & Telegraph Co. and General Telephone Co. were threatening to injure plaintiffs by proposing to enter the one-way radio signaling business in Los Angeles in violation of the antitrust laws. The Ninth Circuit found that plaintiffs had standing even though the California Public Utilities Commission still had to approve the defendants' tariffs and the Federal Communications Commission still had to grant the requisite radio licenses before the defendants could enter the market.

the conduct to the consequences which have in fact occurred.

W. Prosser, *Law of Torts* 244 (4th ed. 1971).

■ The NFL and the member clubs assert that a proximate cause limitation developed under § 4 of the Clayton Act, 15 U.S.C. § 15, the so-called "target area requirement," applies with more or less equal strength to § 16 situations. Section 4 delineates the persons who may sue for treble damages for violation of the antitrust laws.[6] To limit the number of persons who may reap the benefit of treble damages, the Ninth Circuit held in *Vehicle Air Pollution,* and in other cases, that standing under § 4 will be granted only to those whose injury is within the "target area" of the antitrust violation.[7]

Though the court in *Vehicle Air Pollution* did not specifically address the issue raised by the defendants here, it is clear from the opinion that the target area approach is irrelevant to the question of standing under § 16. The crop farmers in that case were denied standing under § 4 because their injury was not within the target area of the alleged conspiracy by the automobile manufacturers.[8] But the farmers were granted standing under § 16. The only conclusion that can be drawn from these companion holdings is that the target area requirement is inapplicable to the § 16 analysis. Furthermore, the very thing that prompted this Circuit to adopt the target area approach— the availability of treble damages under § 4—is absent from a suit for injunctive relief under § 16. As the court stated in *Vehicle Air Pollution,* standing requirements under § 16 can be more lenient than those under § 4 because "section 16 does not involve punitive and potentially disastrous judgments for treble damages and attorneys' fees; neither is there the potential threat of duplicative recoveries." 481 F.2d at 130 (footnote omitted).

■ Though the strict target area test of proximate cause is inapplicable to this case, to have standing, the Coliseum must nevertheless allege that its injuries will be "proximately caused" by the defendants' challenged rules. *Universal Brands, Inc. v. Philip Morris, Inc.,* 546 F.2d 30 (5th Cir. 1977), *cited with approval in John Lenore & Co. v. Olympia Brewing Co.,* 550 F.2d 495, 500 n.5 (9th Cir. 1977). The Coliseum has adequately pled proximate cause.

### C. Causation in Fact

■ Finally, to be granted standing, the Coliseum must allege that the NFL's Constitution and By-laws will in fact cause the Coliseum to be without a professional football team as a tenant, resulting in a loss of revenue. *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

■ To allege the necessary causal relationship, it would seem that the Coliseum must, at a minimum, allege that it is rea-

---

**6.** Section 4 of the Clayton Act, 15 U.S.C. § 15, reads:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

**7.** The Ninth Circuit most recently defined the "target area" test in *Solinger v. A & M Records, Inc.,* 586 F.2d 1304, 1311 (9th Cir. 1978): "In order to have standing under section 4 . . ., [plaintiff] must show that the injury occurred within an area of the economy that foreseeably would have been affected by the antitrust violation alleged."

**8.** The court in *Vehicle Air Pollution* stated that:

> [The] area of the economy against which anticompetitive conduct was allegedly directed was that concerned with research, development, manufacture, installation and patenting of automotive air pollution control devices. No commercial interest of the crop farmers falls within this area. Not only were the crop farmers not targets of the alleged conspiracy, they were not even on the firing range.

481 F.2d at 129 (footnote omitted). The court went on to state that plaintiffs who fall within the target area would "include an alleged inventor and a manufacturer of motor vehicle air pollution control equipment who claim losses from asserted inability to market their devices." *Id.* at 129 n.10.

sonably likely that the NFL clubs will not approve a transfer to Los Angeles or an expansion team for Los Angeles prior to the 1980–81 season. For if the clubs are in fact willing to approve a replacement team, it could not be said that the three-fourths vote requirement, embodied in sections 3.1 and 4.3 of the NFL's Constitution and By-laws, will cause the Coliseum any harm.

Furthermore, as the defendants point out, a number of things could happen that would prevent the Coliseum from obtaining a team regardless of whether the owners vote to deny a replacement team for Los Angeles. For example, a transfer or an expansion team might decide to play in a stadium in Los Angeles County other than the Coliseum. If such were true, then, as far as the Coliseum is concerned, any vote of the team owners would be irrelevant. Thus, the question arises whether, to allege causation, the Coliseum must allege that the likely future events are such that the only thing blocking it from obtaining a team is the probable negative vote of the owners. In other words, must the Coliseum allege that injunctive relief will, if granted, significantly affect its chances to obtain another team?

As discussed earlier, the Supreme Court in *Zenith Radio* held that a § 16 plaintiff must "demonstrate a significant threat of injury . . . from a contemporary violation [of the antitrust laws] likely to continue or recur." 395 U.S. at 130, 89 S.Ct. at 1580. If, for example, it is likely that the only team that wants to move to Los Angeles desires to play in the Rose Bowl, then there is no *significant* threat of injury to the Coliseum *resulting from* section 4.3 of the NFL's Constitution and By-laws, the section that relates to the transfer of teams. Thus, to state the requisite "significant threat," the Coliseum must allege a reasonable likelihood that an affirmative vote by the club owners would bring a team to the Coliseum.

The court's conclusion is supported by the recent holdings of the Supreme Court on the question of standing to sue. In *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), plaintiffs challenged the legality of the zoning ordinance of the town of Penfield, New York. They alleged that the ordinance had the purpose and effect of excluding persons of low and moderate income from living in Penfield. Among the plaintiffs were four low and moderate income individuals who desired to live in Penfield, but who allegedly were precluded from doing so by the ordinance. The Court denied them standing. It said that even if the ordinance had the effect of excluding low and moderate income individuals, the plaintiffs had failed to allege that builders stood ready to construct housing at a price plaintiffs could afford, if the ordinance were struck down. Without such an allegation, no actionable causal relationship could be said to exist, nor could it be said that court-ordered relief would benefit the plaintiffs in a tangible way. It follows, therefore, that just as the plaintiffs in *Warth* had to allege that the likely future actions of builders were such that the only thing blocking their access to housing in Penfield was the challenged ordinance, the Coliseum here must allege that the likely future events are such that the only thing preventing it from obtaining a transfer or an expansion team is the probable negative vote of more than one-fourth of the owners.

The standard this court must apply, in deciding whether court-ordered relief would benefit the Coliseum in a tangible way and whether an actionable causal relationship exists, was most recently stated by the Supreme Court in *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 41–42, 96 S.Ct. 1917, 1924, 1926, 48 L.Ed.2d 450 (1976):

> [W]hen a plaintiff's standing is brought into issue the relevant inquiry is whether . . . the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision.
>
> . . . . .
>
> . . . [T]he "case or controversy" limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not

injury that results from the independent action of some third party . . . .

*Accord, Starbuck v. City & County of San Francisco,* 556 F.2d 450 (9th Cir. 1977); *Bowker v. Morton,* 541 F.2d 1347 (9th Cir. 1976).

Thus, with respect to the claim that section 4.3 violates the antitrust laws and precludes the Coliseum from obtaining a transfer team, the complaint must allege the following to set forth an actionable causal relationship indicating that court-ordered relief would benefit the Coliseum:

1) that it is reasonably likely that an existing NFL team is seriously interested in moving to Los Angeles;

2) that it is reasonably likely that a transfer team would decide to play its home games in the Coliseum;

3) that it is reasonably likely that the transfer team and the Coliseum would be able to agree on lease terms; and

4) that it is reasonably likely that pursuant to section 4.3, the NFL members will not approve the transfer of an existing team to Los Angeles and the Coliseum before the 1980–81 season.

Elements one and two are adequately alleged in the Coliseum's complaint, but not elements three and four. Therefore, the complaint is dismissed with leave to amend.

Similarly, with respect to the claim that section 3.1 violates the antitrust laws and precludes the Coliseum from obtaining an expansion team, the following must be alleged:

1) that it is reasonably likely that the NFL will not place an expansion team in Los Angeles and the Coliseum before the 1980–81 season;

2) that it is reasonably likely that an owner can be found for an expansion team in Los Angeles;

3) that it is reasonably likely that an expansion team would decide to play in the Coliseum; and

4) that it is reasonably likely that an expansion team and the Coliseum would be able to agree on lease terms.

None of these facts have been alleged. Again, therefore, the complaint must be dismissed with leave to amend.

In conclusion, the motion to dismiss is granted with leave to amend so that the Coliseum may adequately plead the existence of threatened injury and causation in fact, as more particularly set forth above. This is necessary to insure that the Coliseum "has 'alleged such a personal stake in the outcome of the controversy' as to warrant [its] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on [its] behalf." *Warth v. Seldin,* 422 U.S. at 498–99, 95 S.Ct. at 2205.

## II. *Motion for Partial Summary Judgment*

The Coliseum moves for partial summary judgment on the ground that sections 3.1 and 4.3 of the NFL's Constitution and By-laws violate § 1 of the Sherman Act. Because the Coliseum has not adequately pled standing, a jurisdictional requirement in federal courts, partial summary judgment may not be granted irrespective of the merits of the Coliseum's claim.

In all likelihood, however, the Coliseum will be able to state the necessary allegations in its amended complaint. Accordingly, the court believes it appropriate to address at this time the issues raised by the Coliseum's motion so that this litigation may move forward expeditiously.

## A. *Are NFL Teams Economic Competitors?*

 The dominant purpose of § 1 of the Sherman Act is to maintain competition among independent business firms. L. Sullivan, *Antitrust* 152–54 (1977). The NFL and its member teams assert that the teams are not independent firms who engage in economic competition but rather are joint venturers,[9] and as such are beyond the reach of § 1 of the Sherman Act.

---

9. Strictly speaking, the NFL teams are not engaged in a joint venture. "A joint venture is a joint business undertaking of two or more parties who share the risks as well as the profits of the business." 10 Von Kalinowski, *Antitrust Laws and Trade Regulation* § 73.08[1], at 73–

Whether NFL teams engage in economic competition as independent units is a troublesome question.[10] The relationship between the teams does not fit the traditional competitive mold. As defendants point out, in certain areas cooperation among the teams, not competition, is required to produce an entertainment product. For example, the teams must adopt playing rules and agree to a playing schedule. In addition, the teams cooperate in a number of other significant ways, though this cooperation may or may not be essential to producing an entertainment product. For example, live gate receipts from all regular season games are divided "sixty-forty" between the home and visiting teams, after certain limited deductions are made. The television rights of all NFL teams are jointly sold to the networks and television revenue is divided equally among all the teams. With regard to expenses, the teams share the cost of the NFL office and the cost of conducting promotional activities. Finally, the teams cooperate in administering a player draft designed to promote competitive balance on the playing field. Competitive balance heightens spectator interest which translates into greater revenue for the NFL.

On the other side of the ledger, each NFL team is separately owned. Profits and losses are not shared. The teams compete for college players and NFL players who are "free agents."[11] This competition for players has an economic aspect because winning

teams may bring in more revenue. Depending on their proximity, teams also may compete for fans. If another NFL team were to play its home games in the Coliseum, that team and the Rams would compete to some extent for fan support in the Southern California area and thus for ticket sales and other revenue. At present, the location of the San Francisco Forty-niners vis-a-vis the Oakland Raiders, the location of the Baltimore Colts vis-a-vis the Washington Redskins, and the location of the New York Jets vis-a-vis the New York Giants, suggests that these pairs of teams compete for dollars found in the pockets of football fans.

Moreover, the fact that NFL teams cooperate or act concertedly in a number of significant ways is ambiguous evidence on the question whether they are economic competitors. These cooperative efforts may indicate the presence of antitrust violations rather than the existence of a joint venture that is immune from the antitrust laws. In fact certain cooperative practices adopted by the NFL that unduly restrict competition for players have been struck down as violative of the antitrust laws. *Smith v. Pro Football, Inc.,* 193 U.S.App.D.C. 19, 593 F.2d 1173 (D.C. Cir. 1978, as amended on Jan. 31, 1979) (NFL player draft held to be unreasonable restraint of trade in violation of § 1 of the Sherman Act); *Mackey v. National Football League,* 543 F.2d 606 (8th Cir. 1976), *cert. dismissed,* 434 U.S. 801, 98

165 (1977) (footnote omitted). Though the NFL teams share revenues, they do not share profits or losses.

**10.** The opinion of the Court of Appeals for the District of Columbia in *Smith v. Pro Football, Inc.,* 193 U.S.App.D.C. 19, 593 F.2d 1173 (D.C. Cir. 1978, as amended on Jan. 31, 1979), illustrates the confusion surrounding the question whether NFL teams are economic competitors. In discussing whether to apply the *per se* or the rule of reason test of illegality under § 1 of the Sherman Act, the court flatly stated that "the NFL clubs which have 'combined' to implement the draft are not *competitors* in any economic sense. The clubs operate basically as a joint venture . . . ." Slip opinion at 24–25, 593 F.2d at 1178–1179 (footnote omitted). Yet in applying the rule of reason to the NFL draft, the court held that the draft "is undeniably

anticompetitive both in its purpose and in its effect." *Id.* at 31, 593 F.2d at 1185. The court went on to say that: "The draft is anticompetitive in its effect on the market for players' services, because it virtually eliminates economic competition among buyers [the NFL teams] for the services of sellers." *Id.* at 32, 593 F.2d at 1186.

**11.** When a player signs a Standard Player Contract with a team, he becomes bound to that team for a certain period of time. Once that period expires, however, he then may become a free agent and negotiate a new contract with another team. *Mackey v. National Football League,* 543 F.2d 606, 610 (8th Cir. 1976), *cert. dismissed,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977).

S.Ct. 28, 54 L.Ed.2d 59 (1977) (so-called "Rozelle Rule," which had the effect of restricting the movement of free agents between teams, held unlawful); *Kapp v. National Football League,* 390 F.Supp. 73 (N.D.Cal. 1974), *aff'd on other grounds,* 586 F.2d 644 (9th Cir. 1978) (Rozelle Rule, NFL player draft, the "no tampering rule," and the Standard Player Contract held violative of the antitrust laws).

Furthermore, even if the court accepts the contention that the NFL teams are joint venturers, this does not necessarily mean that they are not economic competitors for purposes of § 1 of the Sherman Act. In *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951), the defendant companies attempted to justify the challenged restraints of trade by characterizing their operations as a joint venture. The Supreme Court rejected this argument:

> Nor do we find any support in reason or authority for the proposition that agreements between legally separate persons and companies to suppress competition among themselves and others can be justified by labeling the project a "joint venture." Perhaps every agreement and combination to restrain trade could be so labeled.

*Id.* at 598, 71 S.Ct. at 975. Since the NFL teams are legally separate companies, the Supreme Court's reasoning would arguably apply to this case.

■■■ The court concludes that competition for players and, depending on a team's location, competition for fans, indicates that the NFL teams are economic competitors, though not in the traditional sense. This view is supported by a number of cases where courts have held that the rules of a professional sports league violated § 1 of the Sherman Act. In reaching that conclusion, these courts necessarily found that the teams making up the league were engaged

in economic competition. *Smith v. Pro Football, Inc., supra; Mackey v. National Football League, supra; Kapp v. National Football League, supra; Denver Rockets v. All-Pro Management, Inc.,* 325 F.Supp. 1049, 1056–57 (C.D.Cal.1971), *stay vacated sub nom., Haywood v. National Basketball Association,* 401 U.S. 1204, 91 S.Ct. 672, 28 L.Ed.2d 206 (1971) (Douglas, J., in chambers). *See Robertson v. National Basketball Association,* 389 F.Supp. 867, 893–96 & 67 F.R.D. 691, 694 n.3 (S.D.N.Y.1975); *Nassau Sports v. Hampson,* 355 F.Supp. 733 (D.Minn.1972); *Boston Professional Hockey Association, Inc. v. Cheevers,* 348 F.Supp. 261, 267 (D.Mass.), *remanded,* 472 F.2d 127 (1st Cir. 1972).[12]

### B. *Sherman Act § 1 Analysis*

■■■ Section 1 of the Sherman Act, 15 U.S.C. § 1, in relevant part provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal . . . ." While this language, read literally, could outlaw nearly every type of commercial understanding, the Supreme Court long ago held that only those agreements that impose an unreasonable restraint on competition are prohibited. *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

In evaluating whether a particular restraint is unreasonable and thus unlawful, courts have developed two complementary modes of analysis. On the one hand, there is the rule of reason. Under it, the competitive effect of a restraint is determined only after analyzing the facts peculiar to the business, the nature of the restraint and its effects, the history of the restraint, and the reasons why the restraint was imposed. *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 244, 38 S.Ct. 242, 62 L.Ed.

---

12. Defendants cite *San Francisco Seals, Ltd. v. National Hockey League,* 379 F.Supp. 966 (C.D. Cal.1974), and *Levin v. National Basketball Association,* 385 F.Supp. 149 (S.D.N.Y.1974), in support of their argument that they are members of a joint venture, and are not economic competitors. Both cases, however, merely held that the actions complained of did not have any anticompetitive effect, and both courts noted that joint action by members of a professional sports league can have antitrust implications.

683 (1918). On the other hand, certain types of restraints are considered so plainly anticompetitive that they are deemed "illegal *per se.*" Under this mode of analysis, no elaborate study of the industry is made and the purported justifications for the restraint are not considered. *Northern Pacific R. Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

### 1. *Per Se Illegality*

The Coliseum challenges the validity of sections 3.1 and 4.3 of the NFL's Constitution and By-laws on the ground that these sections are *per se* illegal under § 1 of the Sherman Act. The *per se* rule is a judicial shortcut applied to those types of business agreements that the courts, after considerable experience, have found to be consistently unreasonable and therefore, plainly anticompetitive. As the Supreme Court stated in *Northern Pacific R. Co. v. United States:*

> [T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.

356 U.S. at 5, 78 S.Ct. at 518.

One type of agreement courts have found to be so pernicious as to be illegal *per se* is "an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." *United States v. Topco Associates, Inc.,* 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972). In *Topco,* the Supreme Court struck down an agreement between operators of independent supermarket chains to allocate territories. Professor Sullivan succinctly summarized the facts in *Topco:*

> [The independent operators'] stores competed with other grocery stores, including those of the large national and regional chains. Those large chains sold nationally advertised products and also utilized so called "house brands" which they had packed for them with their own trade names and marks. None of the independent operators was large enough, alone, to have a house brand, so they all formed a subsidiary which adopted the Topco brand and mark. This subsidiary purchased products bearing this brand label from packers, much as the large chain grocers did, and distributed these name brand products to the participating independents. The arrangement also included provisions to protect the territories of the participating independents from one another.

L. Sullivan, *Antitrust* 216, 217 (1977).[13]

■■■ Sections 3.1 and 4.3 limit the ability of transfer and expansion teams freely to select their home cities. The Coliseum contends that these sections therefore constitute an illegal allocation of territories under *Topco.*[14] Although the sections may be

---

**13.** The district court applied the rule of reason to Topco's practices and held that they were procompetitive and thus reasonable because they promoted competition between the independents and the large chains. The Supreme Court rejected this finding, not because the Court questioned its validity, but because it found that the defendants had engaged in a clear allocation of territories and that therefore a *per se* violation of § 1 existed. As the Court put it, the inability of courts "to weigh, in any meaningful sense, destruction of competition in one sector of the economy against promotion of competition in another sector is one important reason we have formulated *per se* rules." 405 U.S. at 609–10, 92 S.Ct. at 1134.

**14.** Another practice that is proscribed by the *per se* rule is the group boycott. *E. g., Silver v.*

*New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). A group boycott "is a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level." *Smith v. Pro Football, Inc.,* slip opinion at 24 of 193 U.S.App.D.C., at 1178 of 593 F.2d (footnote omitted).

With respect to section 3.1 of the NFL's Constitution and By-laws, which requires a three-fourths vote before a new member may be admitted into the NFL, an argument could be made that not only is it an agreement to allocate territories, but that it is also, in part, a group boycott. If one were to argue that section 3.1 is *per se* illegal insofar as it requires a three-fourths vote before *any* new team may be admitted into the NFL, then one would be con-

characterized as agreements to allocate territories, the court believes that it would be inappropriate in the circumstances of this case to apply *Topco's per se* rule.

The reason why this case differs from *Topco* is that the economic competitors here must act concertedly—i. e., they must cooperate to some extent for competition to take place at all. If the teams did not cooperate, a professional football league such as the NFL would not exist and economic competition among the teams would then not occur.[15] For example, as discussed earlier, the teams must cooperate to the extent of agreeing on playing rules and playing schedules, or no games would be played and no league would exist.

Moreover, sections 3.1 and 4.3, the very sections challenged here, appear, on their face, to promote competition to some degree. The reason for this observation is as follows: In order for professional football games to be played (and thus for economic competition to exist), the teams must not only agree on *how* the games are to be played, by adopting playing rules, and *who* the participating teams are to be, by adopting playing schedules, but also must agree on *where* the games are to be played. Games, traditionally, are played where one of the participating teams has its home city. Therefore, an agreement on where the games are to be played necessarily involves an agreement on the location of each team's home city. Sections 3.1 and 4.3 provide a mechanism whereby the NFL teams can agree on where each transfer or expansion team is to be located—to that extent these sections are agreements on where games are to be played. Because some sort of agreement is needed to determine where

each team is to have its home city, however, this does not necessarily mean that it is reasonable and thus legal for the agreement to contain a three-fourths vote requirement, as provided in sections 3.1 and 4.3. In fact, it may be that the only type of agreement that is reasonable is one whereby the teams agree that an existing or a new team may play its home games in whichever city it selects. But this does not detract from the fact that an agreement regarding the location of teams, whatever its terms, does to some extent promote competition by determining where games are to be played, thereby making it possible for the sports events to take place.

Thus, sections 3.1 and 4.3 cannot be deemed *per se* illegal under the standards set forth in *Northern Pacific R. Co.* Because these agreements promote competition to some extent, it cannot be said that they have a "pernicious effect on competition" or that they lack "any redeeming virtue." *Northern Pacific R. Co.,* 356 U.S. at 5, 78 S.Ct. at 518. Wooden application of the *per se* rule in this context would risk outlawing provisions that may be reasonable and thus lawful.

Other courts, when faced with ruling on the antitrust implications of the NFL's cooperative agreements, have concluded that it would be inappropriate to apply the *per se* standard. *Smith v. Pro Football, Inc., supra; Mackey v. National Football League, supra; Kapp v. National Football League, supra. But see Bowman v. National Football League,* 402 F.Supp. 754 (D.Minn.1975).

It follows, therefore, that the legality of sections 3.1 and 4.3 must be tested under the rule of reason.

---

tending, under the definition of a "group boycott" set forth above, that section 3.1 is an illegal group boycott of new teams. But since the Coliseum is contending only that section 3.1 is an illegal allocation of territories, its argument must only be that section 3.1 is *per se* illegal insofar as it requires a three-fourths vote to determine the *location* of an expansion team.

**15.** Theoretically, without an organized league, professional football teams could still independently arrange to play exhibitions against one another and thus could continue to compete in the economic arena for players and fans. But the history of professional sports in this country indicates that professional teams, with rare exceptions (such as the Harlem Globetrotters), exist only in the context of a league structure.

## 2. Rule of Reason

■ Under the rule of reason, the court must balance the anticompetitive evils of the challenged restraints against their procompetitive virtues to determine whether the restraints are reasonable and thus legal. As stated by the Supreme Court in *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918): "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." In examining the challenged restraints, the court must look to both their purpose and effect. L. Sullivan, *Antitrust* § 71 (1977). The court may not, however, consider virtues possessed by the restraints that are not procompetitive in nature. *National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). According to *Professional Engineers:*

> [T]he purpose of [antitrust] analysis is to form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry. Subject to exceptions defined by statute, that policy decision has been made by the Congress.

*Id.* at 692, 98 S.Ct. at 1365.[16]

The Coliseum argues that if its *per se* analysis is not accepted, the court nevertheless should at this time invalidate sections 3.1 and 4.3 under the rule of reason. The Coliseum contends that the challenged sections are anticompetitive in that they assertedly insulate the Rams from competition—with respect to gate receipts, other revenues, and players—that would exist if another NFL team were playing in the Coliseum. The Coliseum further contends that the justifications offered in support of sections 3.1 and 4.3 represent, on their face, nothing more than a desire on the part of the NFL teams to maximize profits. Though profit maximization is certainly in the best interests of the football industry, it is not, by itself, a procompetitive justification and, under *Professional Engineers,* may not be factored into the reasonableness determination. The Coliseum concludes therefore, that since there is nothing on the procompetitive side of the scale to balance out the anticompetitive effect of the sections, they are unreasonable and illegal under § 1 of the Sherman Act.

The NFL and its member teams argue that they have a lawful and important interest in the location of each of the teams. This interest assertedly arises because the teams share gate receipts and television revenues, because of problems involving travel costs, and because of problems involving the geographic alignment of the NFL. At this stage of the case, the record on how these items translate into procompetitive justifications has not been developed.

At the heart of the Coliseum's argument is its assertion that, on their face, the justifications offered for sections 3.1 and 4.3 are not procompetitive. But the Coliseum is incorrect because, as stated above, these sections on their face do have a procompetitive aspect.

A final determination of whether sections 3.1 and 4.3 are illegal under the rule of reason cannot be made at this stage of the litigation. Aside from the fact that the Coliseum has not properly alleged standing,

---

**16.** In *Professional Engineers,* the Court considered the legality of a canon of ethics promulgated by the National Society of Professional Engineers that prohibited the member engineers from engaging in competitive bidding. The Society justified the restraint as being in the public interest because price competition assertedly would result in inferior engineering work which in turn would endanger the public safety. The Court held that this was not a procompetitive justification and therefore was irrelevant to the reasonableness analysis. It thus affirmed the court of appeals' ruling striking down the canon.

the record is devoid of evidence necessary to make this determination. Further evidence needs to be submitted concerning the business of professional football, the nature of the restraints and their effects, their history, and the reasons why they were imposed.

The court, of course, intimates no opinion on whether the challenged sections of the NFL's Constitution and By-laws are unreasonable restraints of trade under § 1 of the Sherman Act.

*Conclusion*

The motions to dismiss the Coliseum's complaint are granted with leave to amend within thirty days to enable the Coliseum adequately to allege standing.

The motion for partial summary judgment filed by the Coliseum is denied. Final determination cannot be made of the Coliseum's claim under § 1 of the Sherman Act until standing is properly alleged. In addition, though the NFL teams are economic competitors, for the reasons set forth above it is inappropriate to apply the *per se* analysis to the challenged sections of the NFL's Constitution and By-laws. Application of the rule of reason must be postponed until the record has been fully developed.

THEREFORE, IT IS SO ORDERED.